United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 4, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-20588

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

DAVID KAY; DOUGLAS MURPHY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
(No. Crim.A.H-01-914)

_____

Before WIENER, BENAVIDES and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-appellant, the United States of America ("government") appeals the district court's grant of the motion of defendants-appellees David Kay and Douglas Murphy ("defendants") to dismiss the Superseding Indictment[1] ("indictment") that charged them with bribery of foreign officials in violation of the Foreign Corrupt Practices Act ("FCPA").[2] In their dismissal motion, defendants contended that the indictment failed to state an offense against them. The principal dispute in this case is whether, if

---

[1] A copy of the Superseding Indictment is appended hereto in its entirety and identified as Appendix A.

[2] 15 U.S.C. § 78dd-1 et seq. (2000).

proved beyond a reasonable doubt, the conduct that the indictment ascribed to defendants in connection with the alleged bribery of Haitian officials to understate customs duties and sales taxes on rice shipped to Haiti to assist American Rice, Inc. in obtaining or retaining business was sufficient to constitute an offense under the FCPA. Underlying this question of sufficiency of the contents of the indictment is the preliminary task of ascertaining the scope of the FCPA, which in turn requires us to construe the statute.

The district court concluded that, as a matter of law, an indictment alleging illicit payments to foreign officials for the purpose of avoiding substantial portions of customs duties and sales taxes to obtain or retain business are not the kind of bribes that the FCPA criminalizes. We disagree with this assessment of the scope of the FCPA and hold that such bribes could (but do not necessarily) come within the ambit of the statute. Concluding in the end that the indictment in this case is sufficient to state an offense under the FCPA, we remand the instant case for further proceedings consistent with this opinion. Nevertheless, on remand the defendants may choose to submit a motion asking the district court to compel the government to allege more specific facts regarding the intent element of an FCPA crime that requires the defendant to intend for the foreign official's anticipated conduct in consideration of a bribe (hereafter, the "quid pro quo") to produce an anticipated result —— here, diminution of duties and taxes —— that would assist (or is meant to assist) in obtaining or

2

retaining business (hereafter, the "business nexus element").  If so, the trial court will need to decide whether (1) merely quoting or paraphrasing the statute as to that element (as was done here) is sufficient, or (2) the government must allege additional facts as to just what business was sought to be obtained or retained in Haiti and just how the intended quid pro quo was meant to assist in obtaining or retaining such business.  We therefore reverse the district court's dismissal of the indictment and remand for further consistent proceedings.

## I. FACTS AND PROCEEDINGS

American Rice, Inc. ("ARI") is a Houston-based company that exports rice to foreign countries, including Haiti.  Rice Corporation of Haiti ("RCH"), a wholly owned subsidiary of ARI, was incorporated in Haiti to represent ARI's interests and deal with third parties there.  As an aspect of Haiti's standard importation procedure, its customs officials assess duties based on the quantity and value of rice imported into the country.  Haiti also requires businesses that deliver rice there to remit an advance deposit against Haitian sales taxes, based on the value of that rice, for which deposit a credit is eventually allowed on Haitian sales tax returns when filed.

In 2001, a grand jury charged Kay with violating the FCPA and subsequently returned the indictment, which charges both Kay and Murphy with 12 counts of FCPA violations.  As is readily apparent

3

on its face, the indictment contains detailed factual allegations about (1) the timing and purposes of Congress's enactment of the FCPA, (2) ARI and its status as an "issuer" under the FCPA, (3) RCH and its status as a wholly owned subsidiary and "service corporation" of ARI, representing ARI's interest in Haiti, and (4) defendants' citizenship, their positions as officers of ARI, and their status as "issuers" and "domestic concerns" under the FCPA. The indictment also spells out in detail how Kay and Murphy allegedly orchestrated the bribing of Haitian customs officials to accept false bills of lading and other documentation that intentionally understated by one-third the quantity of rice shipped to Haiti, thereby significantly reducing ARI's customs duties and sales taxes. In this regard, the indictment alleges the details of the bribery scheme's machinations, including the preparation of duplicate documentation, the calculation of bribes as a percentage of the value of the rice not reported, the surreptitious payment of monthly retainers to Haitian officials, and the defendants' purported authorization of withdrawals of funds from ARI's bank accounts with which to pay the Haitian officials, either directly or through intermediaries —— all to produce substantially reduced Haitian customs and tax costs to ARI. Further, the indictment alleges discrete facts regarding ARI's domestic incorporation and place of business, as well as the particular instrumentalities of interstate and foreign commerce that defendants used or caused to be used in carrying out the purported bribery.

4

In contrast, without any factual allegations, the indictment merely paraphrases the one element of the statute that is central to this appeal, only conclusionally accusing defendants of causing payments to be made to Haitian customs officials:

> for purposes of influencing acts and decisions of such foreign officials in their official capacities, inducing such foreign officials to do and omit to do acts in violation of their lawful duty, and to obtain an improper advantage, in order to <u>assist</u> American Rice, Inc. in <u>obtaining and retaining business</u> for, and directing business to American Rice, Inc. and Rice Corporation of Haiti. (Emphasis added).

Although it recites in great detail the discrete facts that the government intends to prove to satisfy each other element of an FCPA violation, the indictment recites no particularized facts that, if proved, would satisfy the "assist" aspect of the business nexus element of the statute, i.e., the nexus between the illicit tax savings produced by the bribery and the assistance such savings provided or were intended to provide in <u>obtaining or retaining business</u> for ARI and RCH. Neither does the indictment contain any factual allegations whatsoever to identify just <u>what</u> business in Haiti (presumably some rice-related commercial activity) the illicit customs and tax savings assisted (or were intended to assist) in obtaining or retaining, or just <u>how</u> these savings were supposed to assist in such efforts. In other words, the indictment recites no facts that could demonstrate an actual or intended cause-and-effect nexus between reduced taxes and obtaining identified business or retaining identified business opportunities.

5

In granting defendants' motion to dismiss the indictment for failure to state an offense, the district court held that, as a matter of law, bribes paid to obtain favorable tax treatment are not payments made to "obtain or retain business" within the intendment of the FCPA, and thus are not within the scope of that statute's proscription of foreign bribery.[3] The government timely filed a notice of appeal.

## II. ANALYSIS

### A. **Standard of Review**

We review <u>de novo</u> questions of statutory interpretation, as well as "whether an indictment sufficiently alleges the elements of an offense."[4] As a motion to dismiss an indictment for failure to state an offense is a challenge to the sufficiency of the indictment, we are required to "take the allegations of the indictment as true and to determine whether an offense has been stated."[5]

"[I]t is well settled that an indictment must set forth the offense with sufficient clarity and certainty to apprise the accused of the crime with which he is charged."[6] The test for sufficiency

---

[3] <u>United States v. Kay</u>, 200 F. Supp. 2d 681, 686 (S.D. Tex. 2002).

[4] <u>United States v. Santos-Riviera</u>, 183 F.3d 367, 369 (5th Cir. 1999).

[5] <u>United States v. Hogue</u>, 132 F.3d 1087, 1089 (5th Cir. 1998).

[6] <u>United States v. Bearden</u>, 423 F.2d 805, 810 (5th Cir. 1970) (citations omitted).

is "not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards"; namely, that it "[(1)] contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and [(2)], enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."[7]

Because an offense under the FCPA requires that the alleged bribery be committed for the purpose of inducing foreign officials to commit unlawful acts, the results of which will assist in obtaining or retaining business in their country, the questions before us in this appeal are (1) whether bribes to obtain illegal but favorable tax and customs treatment can ever come within the scope of the statute, and (2) if so, whether, in combination, there are minimally sufficient facts alleged in the indictment to inform the defendants regarding the nexus between, on the one hand, Haitian taxes avoided through bribery, and, on the other hand, assistance in getting or keeping some business or business opportunity in Haiti.

B.  **Words of the FCPA**

"[T]he starting point for interpreting a statute is the language of the statute itself."[8]   When construing a criminal

---

[7] United States v. Ramirez, 233 F.3d 318, 323 (5th Cir. 2000).

[8] Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc. 447 U.S. 102, 108 (1980).

statute, we "must follow the plain and unambiguous meaning of the statutory language."[9]  Terms not defined in the statute are interpreted according to their "ordinary and natural meaning...as well as the overall policies and objectives of the statute."[10]  Furthermore, "a statute must, if possible, be construed in such fashion that every word has some operative effect."[11]  Finally, we have found it "appropriate to consider the title of a statute in resolving putative ambiguities."[12]  If, after application of these principles of statutory construction, we conclude that the statute is ambiguous, we may turn to legislative history.  For the language to be considered ambiguous, however, it must be "susceptible to more than one reasonable interpretation"[13] or "more than one accepted meaning."[14]

The FCPA prohibits payments to foreign officials for purposes of:

---

[9] Salinas v. United States, 522 U.S. 52, 57 (1997) (citations and quotation marks omitted).

[10] United States v. Lowe, 118 F.3d 399, 402 (5th Cir. 1997) (citations omitted).

[11] United States v. Nordic Village, Inc., 503 U.S. 30, 36 (1992) (recognizing this principle as a "settled rule"); United States v. Naranjo, 259 F.3d 379, 383 (5th Cir. 2001) (citing Nordic Village, Inc.).

[12] United States v. Marek, 238 F.3d 310, 321 (5th Cir. 2001).

[13] Lowe, 118 F.3d at 402.

[14] United Serv. Auto. Ass'n v. Perry, 102 F.3d 144, 146 (5th Cir. 1996).

(i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage...in order to assist [the company making the payment] in obtaining or retaining business for or with, or directing business to, any person.[15]

None contend that the FCPA criminalizes every payment to a foreign official: It criminalizes only those payments that are intended to (1) influence a foreign official to act or make a decision in his official capacity, or (2) induce such an official to perform or refrain from performing some act in violation of his duty, or (3) secure some wrongful advantage to the payor. And even then, the FCPA criminalizes these kinds of payments only if the result they are intended to produce — their quid pro quo — will assist (or is intended to assist) the payor in efforts to get or keep some business for or with "any person." Thus, the first question of statutory interpretation presented in this appeal is whether payments made to foreign officials to obtain unlawfully reduced customs duties or sales tax liabilities can ever fall within the scope of the FCPA, i.e., whether the illicit payments made to obtain a reduction of revenue liabilities can ever constitute the kind of bribery that is proscribed by the FCPA. The district court answered this question in the negative; only if we answer it in the affirmative will we need to analyze the sufficiency of the factual

---

[15] 15 U.S.C. § 78dd-1(a)(1).

allegations of the indictment as to the one element of the crime contested here.

The principal thrust of the defendants' argument is that the business nexus element, i.e., the "assist...in obtaining or retaining business" element, narrowly limits the statute's applicability to those payments that are intended to obtain a foreign official's approval of a bid for a new government contract or the renewal of an existing government contract. In contrast, the government insists that, in addition to payments to officials that lead directly to getting or renewing business contracts, the statute covers payments that indirectly advance ("assist") the payor's goal of obtaining or retaining foreign business with or for some person. The government reasons that paying reduced customs duties and sales taxes on imports, as is purported to have occurred in this case, is the type of "improper advantage" that <u>always</u> will assist in obtaining or retaining business in a foreign country, and thus is always covered by the FCPA.

In approaching this issue, the district court concluded that the FCPA's language is ambiguous, and proceeded to review the statute's legislative history.[16] We agree with the court's finding of ambiguity for several reasons. Perhaps our most significant statutory construction problem results from the failure of the

---

[16] <u>Kay</u>, 200 F. Supp. 2d at 683. Neither the district court nor this court concludes that the ambiguity in the FCPA even closely approaches the level of <u>vagueness</u>, in the constitutional criminal sense, that could lead to declaring the statute void for vagueness.

language of the FCPA to give a clear indication of the exact scope of the business nexus element; that is, the proximity of the required nexus between, on the one hand, the anticipated results of the foreign official's bargained-for action or inaction, and, on the other hand, the assistance provided by or expected from those results in helping the briber to obtain or retain business. Stated differently, how attenuated can the linkage be between the effects of that which is sought from the foreign official in consideration of a bribe (here, tax minimization) and the briber's goal of finding assistance or obtaining or retaining foreign business with or for some person, and still satisfy the business nexus element of the FCPA?

Second, the parties' diametrically opposed but reasonable contentions demonstrate that the ordinary and natural meaning of the statutory language <u>is</u> genuinely debatable and thus ambiguous. For instance, the word "business" can be defined at any point along a continuum from "a volume of trade," to "the purchase and sale of goods in an attempt to make a profit," to "an assignment" or a "project."[17] Thus, dictionary definitions can support both (1) the government's broader interpretation of the business nexus language as encompassing any type of commercial activity, and (2) defendants' argument that "obtain or retain business" connotes a more pedestrian understanding of establishing or renewing a particular commercial

---

[17] <u>Webster's Encyclopedic Unabridged Dictionary</u>, at 201 (1989).

arrangement.  Similarly, although the word "assist" suggests a somewhat broader statutory scope,[18] it does not connote specificity or define either how proximate or how remote the foreign official's anticipated actions that constitute assistance must or may be to the business obtained or retained.

Third, absent a firm understanding of just what "obtaining or retaining business" or "assist" actually include, the parties' remaining arguments  prove little.  For instance, the separation of the statutory prohibition into two aspects —— (1) seeking to induce a foreign official to act in consideration of a bribe (quid pro quo) (2) for purposes of assisting in obtaining or retaining business (business nexus) —— provides little insight into the precise scope of the statute.  The government may be correct in its contention that the quid pro quo requirement expands the scope of the statute, because Congress otherwise could have dispensed with the quid pro quo requirement entirely and simply prohibited only those payments resulting directly in obtaining or retaining business contracts. It is at least plausible, however, as defendants argue, that the quid pro quo requirement was not necessarily meant to expand the statutory scope, but instead was meant to distinguish acts of a foreign official in his official capacity from acts in his private

---

[18] Invoking basic economic principles, the SEC reasoned in its amicus brief that securing reduced taxes and duties on imports through bribery enables ARI to reduce its cost of doing business, thereby giving it an "improper advantage" over actual or potential competitors, and enabling it to do more business, or remain in a market it might otherwise leave.

capacity. Similarly, defendants might be right in urging that the business nexus element restricts the scope of the statute to a smaller universe of payments than those made to obtain <u>any</u> advantage; yet it is conceivable that this restriction was included to exempt more marginal facilitating payments, but not the types of payments that defendants are accused of making.

Neither does the remainder of the statutory language clearly express an exclusively broad or exclusively narrow understanding of the business nexus element. The extent to which the exception for routine governmental action ("facilitating payments" or "grease") is narrowly drawn reasonably suggests that Congress was carving out very limited categories of permissible payments from an otherwise broad statutory prohibition.[19] As defendants suggest, however,

---

[19] Section 78dd-1(b) excepts from the statutory scope "any facilitating or expediting payment to a foreign official...the purpose of which is to expedite or to service the performance of a routine governmental action by a foreign official...." 15 U.S.C. § 78dd-1(b). Section 78dd-1(f)(3)(A), in turn, provides that:
   [T]he term routine governmental action" means only an action which is ordinarily and commonly performed by a foreign official in –
       (i) obtaining permits, licenses, or other official documents to qualify a person to do business in a foreign country;
       (ii) processing governmental papers, such as visas and work orders;
       (iii) providing police protection, mail pick-up and delivery, or scheduling inspections associated with contract performance or inspections related to transit of goods across country;
       (iv) providing phone service, power and water supply, loading and unloading cargo, or protecting perishable products or commodities from deterioration; or
       (v) actions of a similar nature. 15 U.S.C. § 78dd-1(f)(3)(A).

13

another plausible implication for including an express statutory explanation that routine governmental action does not include decisions "to award new business to or to continue business with a particular party,"[20] is that Congress was focusing entirely on identifiable decisions made by foreign officials in granting or renewing specific business arrangements in foreign countries, and not on a more general panoply of competitive business advantages.

The fourth and final interpretive factor, the statute's title — "Foreign Corrupt Practices Act" — is more suggestive of a relatively broad application of its provisions, but only slightly so. By itself, such a generic title fails to make one interpretation of the statutory language more persuasive than another, much less establish one as the only reasonable construction of the statute.[21] In sum, neither the ordinary meaning nor the provisions surrounding the disputed text are sufficiently clear to

---

[20] 15 U.S.C. § 78dd-1(f)(3)(B).

[21] Defendants also contend that the few reported decisions under the FCPA lend additional support to their narrow reading of the statutory language, because each of these cases involved payments linked to the acquisition or renewal of contracts or commercial agreements. See, e.g., United States v. Liebo, 923 F.2d 1308, 1311-12 (8th Cir. 1991) (defendant paid gifts to foreign official in exchange for contract approval); United States v. Castle, 925 F.2d 831, 832 (5th Cir. 1991) (defendants made a payment to win bid to provide buses to Canadian provincial government). According to defendant, these cases did not involve payments made to influence some aspect of existing business, i.e., some particular cost of doing business. Defendants nevertheless concede, and the government reiterates, that none of these decisions squarely addresses the scope of the "obtain and retain business" language.

14

make the statutory language susceptible of but one reasonable interpretation. Inasmuch as Congress chose to phrase the business nexus requirement obliquely, and to say nothing to suggest how remote or how proximate the business nexus must be, we cannot conclude on the basis of the provision itself that the statute is either as narrow or as expansive as the parties respectively claim.

## C. **FCPA Legislative History**

As the statutory language itself is amenable to more than one reasonable interpretation, it is ambiguous as a matter of law. We turn therefore to legislative history in our effort to ascertain Congress's true intentions.

### 1. **1977 Legislative History**

Congress enacted the FCPA in 1977, in response to recently discovered but widespread bribery of foreign officials by United States business interests. Congress resolved to interdict such bribery, not just because it is morally and economically suspect, but also because it was causing foreign policy problems for the United States.[22] In particular, these concerns arose from

---

[22] The House Committee stated that such bribes were "counter to the moral expectations and values of the American public," "erode[d] public confidence in the integrity of the free market system," "embarrass[ed] friendly governments, lower[ed] the esteem for the United States among the citizens of foreign nations, and lend[ed] credence to the suspicions sown by foreign opponents of the United States that American enterprises exert a corrupting influence on the political processes of their nations." H.R. Rep. No. 95-640, at 4-5 (1977); S. Rep. No. 95-114, at 3-4 (1977), reprinted in 1977 U.S.C.C.A.N. 4098, 4100-01..

15

revelations that United States defense contractors and oil companies had made large payments to high government officials in Japan, the Netherlands, and Italy.[23]  Congress also discovered that more than 400 corporations had made questionable or illegal payments in excess of $300 million to foreign officials for a wide range of favorable actions on behalf of the companies.[24]

In deciding to criminalize this type of commercial bribery, the House and Senate each proposed similarly far-reaching, but non-identical, legislation.  In its bill, the House intended "broadly [to] prohibit[] transactions that are <u>corruptly</u> intended to induce the recipient to use his or her influence to affect <u>any</u> act or decision of a foreign official...."[25]  Thus, the House bill contained no limiting "business nexus" element.[26]  Reflecting a somewhat narrower purpose, the Senate expressed its desire to ban payments made for the purpose of inducing foreign officials to act "so as to direct business to any person, maintain an established business opportunity with any person, divert any business opportunity from any person or influence the enactment or

---

[23] H.R. Rep. No. 95-640, at 5; S. Rep. No. 95-114, at 3.

[24] H.R. Rep. No. 95-640, at 4; S. Rep. No. 95-114, at 3.

[25] H.R. Rep. No. 95-640, at 7 (emphasis added).

[26] H.R. Conf. Rep. No. 95-831, at 12 (1977), <u>reprinted in</u> 1977 U.S.C.C.A.N. 4120, 4124-25.

16

promulgation of legislation or regulations of that government or instrumentality."[27]

At conference, compromise language "clarified the scope of the prohibition by requiring that the purpose of the payment must be to influence any act or decision of a foreign official...so as to assist an issuer in obtaining, retaining or directing business to any person."[28]  In the end, then, Congress adopted the Senate's proposal to prohibit only those payments designed to induce a foreign official to act in a way that is intended to facilitate ("assist") in obtaining or retaining of business.

Congress expressly emphasized that it did not intend to prohibit "so-called grease or facilitating payments,"[29] such as "payments for expediting shipments through customs or placing a transatlantic telephone call, securing required permits, or obtaining adequate police protection, transactions which may involve even the proper performance of duties."[30]  Instead of making an express textual exception for these types of non-covered payments, the respective committees of the two chambers sought to distinguish

---

[27] S. Rep. No. 95-114, at 17; S. 305, 95th Cong. § 103 (proposing to ban payments that induce action by a foreign official so as "to assist...in obtaining or retaining business for or with, or directing business to, any person, or influencing legislation or regulations of that government or instrumentality").

[28] H.R. Conf. Rep. 95-831, at 12.

[29] H.R. Rep. No. 95-640, at 4; S. Rep. No. 95-114, at 10.

[30] S. Rep. No. 95-114, at 10.

permissible grease payments from prohibited bribery by only prohibiting payments that induce an official to act "corruptly," i.e., actions requiring him "to misuse his official position" and his discretionary authority,[31] not those "essentially ministerial" actions that "merely move a particular matter toward an eventual act or decision or which do not involve any discretionary action."[32]

In short, Congress sought to prohibit the type of bribery that (1) prompts officials to misuse their discretionary authority and (2) disrupts market efficiency and United States foreign relations,[33] at the same time recognizing that smaller payments intended to expedite ministerial actions should remain outside of the scope of the statute. The Conference Report explanation, on which the district court relied to find a narrow statutory scope, truly offers little insight into the FCPA's precise scope, however; it merely parrots the statutory language itself by stating that the purpose of a payment must be to induce official action "so as to assist an issuer in obtaining, retaining or directing business to any person."[34]

---

[31] H.R. Rep. No. 95-640, at 7-8; S. Rep. No. 95-114, at 10.

[32] H.R. Rep. No. 95-640, at 8. Similarly, when the House defined "foreign official" it excluded those individuals "whose duties are essentially ministerial or clerical." Id.

[33] See Lamb v. Phillip Morris, Inc., 915 F.2d 1024, 1029 (6th Cir. 1990) (finding that "the FCPA was primarily designed to protect the integrity of American foreign policy and domestic markets").

[34] H.R. Conf. Rep. 95-831, at 12.

18

To divine the categories of bribery Congress did and did not intend to prohibit, we must look to the Senate's proposal, because the final statutory language was drawn from it,[35] and from the SEC Report on which the Senate's legislative proposal was based.[36] In distinguishing among the types of illegal payments that United States entities were making at the time, the SEC Report identified four principal categories: (1) payments "made in an effort to procure special and unjustified favors or advantages in the enactment or <u>administration of the tax</u> or other <u>laws</u>" of a foreign country; (2) payments "made with the intent to assist the company in obtaining or retaining government contracts"; (3) payments "to persuade low-level government officials to perform functions or services which they are obliged to perform as part of their governmental responsibilities, but which they may refuse or delay unless compensated" ("grease"), and (4) political contributions.[37] The SEC thus exhibited concern about a wide range of questionable payments (explicitly including the kind at issue here) that were

---

[35] As the House intended its proposed legislation to apply even more broadly to payments soliciting <u>any</u> corrupt act by a foreign official, we assume that any restrictions of scope emanated from the Senate version.

[36] Report of the Securities and Exchange Commission on Questionable and Illegal Corporate Payments and Practices, submitted to the Senate Banking, Housing and Urban Affairs Committee, May 12, 1976 [hereinafter, "SEC Report"]. The Senate Report explained that its bill was identical to the bill introduced the year before, which in turn, was based substantially on the SEC Report and its recommendations. S. Rep. No. 95-114, at 2.

[37] SEC Report, at 25-27 (emphasis added).

resulting in millions of dollars being recorded falsely in corporate books and records.[38]

As noted, the Senate Report explained that the statute should apply to payments intended "to <u>direct business</u> to any person, <u>maintain an established business opportunity</u> with any person, divert any business opportunity from any person or <u>influence the enactment or promulgation of legislation or regulations</u> of that government or instrumentality."[39] We observe initially that the Senate only loosely addressed the categories of conduct highlighted by the SEC Report. Although the Senate's proposal picked up the SEC's concern with a business nexus, it did not expressly cover bribery influencing the administration of tax laws or seeking favorable tax treatment. It is clear, however, that even though the Senate was particularly concerned with bribery intended to secure new business, it was also mindful of bribes that influence legislative or regulatory actions, and those that maintain established business opportunities, a category of economic activity separate from, and much more capacious than, simply "directing business" to someone.

The statute's ultimate language of "obtaining or retaining" mirrors identical language in the SEC Report. But, whereas the SEC Report highlights payments that go toward "obtaining or retaining <u>government contracts</u>," the FCPA, incorporating the Senate Report's

---

[38] <u>Id.</u> at a (Introduction), 25-27.

[39] S. Rep. No. 95-114, at 17 (emphasis added).

20

language, prohibits payments that assist in obtaining or retaining business, not just government contracts. Had the Senate and ultimately Congress wanted to carry over the exact, narrower scope of the SEC Report, they would have adopted the same language. We surmise that, in using the word "business" when it easily could have used the phraseology of SEC Report, Congress intended for the statute to apply to bribes beyond the narrow band of payments sufficient only to "obtain or retain government contracts." The Senate's express intention that the statute apply to corrupt payments that maintain business opportunities also supports this conclusion.

For purposes of deciding the instant appeal, the question nevertheless remains whether the Senate, and concomitantly Congress, intended this broader statutory scope to encompass the administration of tax, customs, and other laws and regulations affecting the revenue of foreign states. To reach this conclusion, we must ask whether Congress's remaining expressed desire to prohibit bribery aimed at getting assistance in retaining business or maintaining business opportunities was sufficiently broad to include bribes meant to affect the administration of revenue laws. When we do so, we conclude that the legislative intent was so broad.

Congress was obviously distraught not only about high profile bribes to high-ranking foreign officials, but also by the pervasiveness of foreign bribery by United States businesses and businessmen. Congress thus made the decision to clamp down on

21

bribes intended to prompt foreign officials to misuse their discretionary authority for the benefit of a domestic entity's business in that country. This observation is not diminished by Congress's understanding and accepting that relatively small facilitating payments were, at the time, among the accepted costs of doing business in many foreign countries.[40]

In addition, the concern of Congress with the immorality, inefficiency, and unethical character of bribery presumably does not vanish simply because the tainted payments are intended to secure a favorable decision less significant than winning a contract bid. Obviously, a commercial concern that bribes a foreign government official to award a construction, supply, or services contract violates the statute. Yet, there is little difference between this example and that of a corporation's lawfully obtaining a contract from an honest official or agency by submitting the lowest bid, and ⸺ either before or after doing so ⸺ bribing a different government official to reduce taxes and thereby ensure that the under-bid venture is nevertheless profitable. Avoiding or lowering taxes reduces operating costs and thus increases profit margins, thereby

---

[40] We recognize that all payments to foreign officials exist on a continuum in which any payment, even if only to connect telephone service in two days instead of two weeks, marginally improves a company's competitive advantage in a foreign country. Nevertheless, Congress was principally concerned about payments that prompt an official to deviate from his official duty, not necessarily payments that get an official to perform properly those usually ministerial duties required of his office. As explained infra, Congress enacted amendments in 1988 in an effort to reflect just how limited it envisioned the grease exception to be.

freeing up funds that the business is otherwise legally obligated to expend. And this, in turn, enables it to take any number of actions to the disadvantage of competitors. Bribing foreign officials to lower taxes and customs duties certainly <u>can</u> provide an unfair advantage over competitors and thereby be of assistance to the payor in obtaining or retaining business. This demonstrates that the question whether the defendants' alleged payments constitute a violation of the FCPA truly turns on whether these bribes were intended to lower ARI's cost of doing business in Haiti enough to have a sufficient nexus to garnering business there or to maintaining or increasing business operations that ARI already had there, so as to come within the scope of the business nexus element as Congress used it in the FCPA. Answering this fact question, then, implicates a matter of proof and thus evidence.

In short, the 1977 legislative history, particularly the Senate's proposal and the SEC Report on which it relied, convinces us that Congress meant to prohibit a range of payments wider than only those that directly influence the acquisition or retention of government contracts or similar commercial or industrial arrangements. On the other end of the spectrum, this history also demonstrates that Congress explicitly excluded facilitating payments (the grease exception). In thus limiting the exceptions to the type of bribery covered by the FCPA to this narrow category, Congress's intention to cast an otherwise wide net over foreign bribery suggests that Congress intended for the FCPA to prohibit all other

illicit payments that are intended to influence non-trivial official foreign action in an effort to aid in obtaining or retaining business for some person. The congressional target was bribery paid to engender assistance in improving the business opportunities of the payor or his beneficiary, irrespective of whether that assistance be direct or indirect, and irrespective of whether it be related to administering the law, awarding, extending, or renewing a contract, or executing or preserving an agreement. In light of our reading of the 1977 legislative history, the subsequent 1988 and 1998 legislative history is only important to our analysis to the extent it confirms or conflicts with our initial conclusions about the scope of the statute.

2. **1988 Legislative History**

After the FCPA's enactment, United States business entities and executives experienced difficulty in discerning a clear line between prohibited bribes and permissible facilitating payments.[41] As a result, Congress amended the FCPA in 1988, expressly to clarify its original intent in enacting the statute. Both houses insisted that their proposed amendments only clarified ambiguities "without changing the basic intent or effectiveness of the law."[42]

---

[41] S. Rep. No. 100-85, at 53 (1987) (stating that "the method chosen by Congress in 1977 to accomplish [the task of distinguishing grease payments from bribery] has been difficult to apply in practice").

[42] Id. at 54; H.R. Rep. No. 100-40, pt. 2, at 77 (1987) (stating that the amendments, particularly the exception for facilitating payments, "will reflect current law and Congressional

24

In this effort to crystallize the scope of the FCPA's prohibitions on bribery, Congress chose to identify carefully two types of payments that are not proscribed by the statute. It expressly excepted payments made to procure "routine governmental action" (again, the grease exception),[43] and it incorporated an affirmative defense for payments that are legal in the country in which they are offered or that constitute bona fide expenditures directly relating to promotion of products or services, or to the execution or performance of a contract with a foreign government or agency.[44]

We agree with the position of the government that these 1988 amendments illustrate an intention by Congress to identify very limited exceptions to the kinds of bribes to which the FCPA does not

intent more clearly").

[43] 15 U.S.C. §§ 78dd-1(b) & (f)(3)(A). See supra note 19 for language of these subsections.

[44] 15 U.S.C. § 78dd-1(c). The subsection provides in full: It shall be an affirmative defense to actions under subsections (a) or (g) of this section that ——
    (1) the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's, political party's, party official's, or candidate's country; or
    (2) the payment, gift, offer, or promise of anything of value that was made, was a reasonable and bona fide expenditure, such as travel and lodging expenses, incurred by or on behalf of a foreign official, party, party official, or candidate and was directly related to ——
        (A) the promotion, demonstration, or explanation of products or services; or
        (B) the execution or performance of a contract with a foreign government or agency thereof. Id.

apply.  A brief review of the types of routine governmental actions enumerated by Congress shows how limited Congress wanted to make the grease exceptions.  Routine governmental action, for instance, includes "obtaining permits, licenses, or other official documents to qualify a person to do business in a foreign country," and "scheduling inspections associated with contract performance or inspections related to transit of goods across country."[45] Therefore, routine governmental action does not include the issuance of <u>every</u> official document or <u>every</u> inspection, but only (1) documentation that qualifies a party to do business and (2) scheduling an inspection —— very narrow categories of largely non-discretionary, ministerial activities performed by mid- or low-level foreign functionaries.  In contrast, the FCPA uses broad, general language in prohibiting payments to procure assistance for the payor in obtaining or retaining business, instead of employing similarly detailed language, such as applying the statute only to payments that attempt to secure or renew particular government contracts. Indeed, Congress had the opportunity to adopt narrower language in 1977 from the SEC Report, but chose not to do so.[46]

---

[45] 15 U.S.C. § 78dd-1(f)(3)(A).

[46] Defendants argue that Congress intended to maintain the statute's narrow scope by excluding from the routine governmental action exception "any decision by a foreign official whether, or on what terms, to award new business to or to continue business with a particular party...."  15 U.S.C. § 78dd-1(f)(3)(B).  We disagree with defendants' contention that the language these amendments indicates a narrow statutory scope.  Read in light of Congress's original desire to stamp out foreign bribery run amok, we find that

Defendants argue, nevertheless, that Congress's decision to reject House-proposed amendments to the business nexus element constituted its implicit rejection of such a broad reading of the statute. The House bill proposed new language to explain that payments for "obtaining or retaining business" also includes payments made for the "procurement of legislative, judicial, regulatory, or other action in seeking more favorable treatment by a foreign government."[47] Indeed, defendants assert, the proposed amendment itself shows that Congress understood the business nexus provision to have narrow application; otherwise, there would have been no need to propose amending it.

Contrary to defendants' contention, the decision of Congress to reject this language has no bearing on whether "obtaining or retaining business" includes the conduct at issue here. In explaining Congress's decision not to include this proposed amendment in the business nexus requirement, the Conference Report stated that the "retaining business" language was

> not limited to the renewal of contracts or other business, but also includes a prohibition against corrupt payments related to the execution or performance of contracts or the carrying out of existing business, such as a payment to a foreign official for the purpose of obtaining more favorable tax treatment....The term should

its intention in 1988 to exclude from the grease exception "decision[s] by a foreign official whether, or on what terms...to continue business with a particular party" replicates the equally capacious language of prohibition in the 1977 legislative history.

[47] H.R. Conf. Rep. 100-576, at 918 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1951.

27

not, however, be construed so broadly as to include lobbying or other normal representations to government officials.[48]

At first blush, this statement would seem to resolve the instant dispute in favor of the government; however, the district court interpreted Congress's decision to leave the business nexus requirement unchanged as a determination not to extend the scope of the statute. The court thus declined to defer to the report because, in the court's estimation, the legislative history "consist[ed] of an after-the-fact interpretation of the term 'retaining business' by a subsequent Congress more than ten years after the enactment of the original language."[49]

We agree that, as a general matter, subsequent legislative history about unchanged statutory language would deserve little or no weight in our analysis. The Supreme Court has instructed that "the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute."[50] In this case, moreover, Congress's enactment of subsequent legislation did not include changes to the business nexus requirement itself.

Nevertheless, the Supreme Court has also stated that "[s]ubsequent legislation declaring the intent of an earlier statute

---

[48] H.R. Conf. Rep. No. 100-576, at 918-19 (emphasis added).

[49] Kay, 200 F. Supp. 2d at 685.

[50] Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 185 (1994) (citations omitted).

28

is entitled to great weight in statutory construction."[51]  And, we have concluded that Congress is "at its most authoritative [when] adding complex and sophisticated amendments to an already complex and sophisticated act."[52]  Although in 1988 Congress refused to alter the business nexus requirement itself, it did enact exceptions and defenses to the statute's applicability, both of which the pertinent Conference Report language helps to explain vis-à-vis the statute's overall scope.  And it must be remembered that clarifying the scope of the 1977 law was the overarching purpose of Congress in enacting the 1988 amendments.[53]  Thus, the legislative history that the district court rejected as irrelevant in fact explains how the 1988 amendments relate to the original scope of the statute and concomitantly to the business nexus element.

First, the Conference Report expresses what is implied by the new affirmative defense for bona fide expenditures for the execution or performance of a contract.  The creation of a defense for <u>bona fide</u> payments strongly implies that <u>corrupt</u>, non-bona-fide payments

---

[51] <u>Red Lion Broad. Co. v. FCC</u>, 395 U.S. 367, 380-81 (1969).

[52] <u>Mount Sinai Hosp. v. Weinberger</u>, 517 F.2d 329, 343 (5th Cir. 1975).

[53] We recognize that the Supreme Court has warned repeatedly that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." <u>Consumer Prod. Safety Comm'n</u>, 447 U.S. at 117 (citations omitted).  The amendments Congress passed in 1988, however, expressly sought to clarify Congress's intent from 1977.  Thus, the views and amendments of Congress in 1988 are necessary to our analysis of the precise scope of the original law.

29

related to contract execution and performance have always been and remain prohibited.  Instead of leaving this prohibition implicit, though, the Conference Report's description of "retaining business" explained that this phrase, and thus the  statutory ambit, includes "a prohibition against <u>corrupt</u> payments related to the execution or performance of contracts...."[54]

Similarly, in its 1988 statutory description of routine governmental action, Congress stated that this exception <u>does not</u> include decisions about "whether, or on what terms...to continue business with a particular party,"[55] which must mean, conversely, that decisions that do relate to "continu[ing] business with a particular party" <u>are</u> covered by, i.e., are not excepted from, the scope of the statute.  The Conference Report, in turn, states that "retaining business" means "the carrying out of existing business," thereby simply repeating statutory intent without explaining it.[56] We discern no meaningful distinction between the phrase "continuing business" in the statutory text, and "carrying out of existing business" in the Conference Report.

Third, the Conference Report states that "retaining business" should not be construed so broadly as to include lobbying or "other

---

[54] H.R. Conf. Rep. 100-576, at 918 (emphasis added).

[55] 15 U.S.C. § 78dd-1(f)(3)(B).

[56] H.R. Conf. Rep. No. 100-576, at 918.

30

normal representations to government officials."[57]  This statement directly reflects the Conference Committee's decision not to include language from the House bill focusing on legislature and regulatory activity so as to avoid any interpretation that might curb legitimate lobbying or representations intended to influence legislative, judicial, regulatory, or other such action.  Thus, like other language of the report, far from being irrelevant to Congress's intentions in 1988, this provides a direct explanation of why Congress elected not to include the newly proposed language.

The remaining contested language in the 1988 Conference Report states that "retaining business" includes — covers — payments such as those made "to a foreign official for the purpose of obtaining more favorable tax treatment."[58]  We know that the SEC was concerned specifically with these types of untoward payments in 1977, and that Congress ultimately adopted the more generally-worded prohibition against payments designed to assist in obtaining or retaining business.  This specific reference in the Conference Report therefore appears to reflect the concerns that initially motivated Congress to enact the FCPA.  But even if this language is not dispositive of the question, the rest of the passage does reflect

---

[57] Id. at 918–19.

[58] Id. at 918 (emphasis added).

Congress's purpose in passing the 1988 amendments, and therefore deserves weight in our analysis.

Finally, it is inaccurate to suggest, as defendants do, that this report language constituted an attempt to insert by subterfuge a meaning for "retaining business" that Congress had expressly rejected in conference. The only language that Congress chose not to adopt regarding the business nexus requirement concerned payments for primarily legislative, judicial, and regulatory advantages.[59] Corrupt payments "related to the execution or performance of contracts or the carrying out of existing business" have no direct connection with the proposed language on legislative, judicial, and regulatory action, and thus were not part of the proposed amendment.[60]

### 3. **1998 Legislative History**

In 1998, Congress made its most recent adjustments to the FCPA when the Senate ratified and Congress implemented the Organization of Economic Cooperation and Development's Convention on Combating Bribery of Foreign Public Officials in International Business

---

[59] We recognize that the House proposal prohibited payments for "procurement of legislative, judicial, regulatory, or other action in seeking more favorable treatment by a foreign government." H.R. Rep. No. 100-40, pt. 2, at 75. Applying the ejusden generis maxim, we must conclude that by using a term as vague as "other action" directly after the words "legislative, judicial, or regulatory," Congress intended to include only actions quite similar to these types in its amendment, not any other conceivable action (aside from discrete contractual arrangements) that might result in favorable treatment from a foreign government.

[60] H.R. Conf. Rep. No. 100-576, at 918.

Transactions (the "Convention"). Article 1.1 of the Convention prohibits payments to a foreign public official to induce him to "act or refrain from acting in relation to the performance of official duties, in order to obtain or retain business <u>or other improper advantage</u> in the conduct of international business."[61] When Congress amended the language of the FCPA, however, rather than inserting "any improper advantage" immediately following "obtaining or retaining business" within the business nexus requirement (as does the Convention), it chose to add the "improper advantage" provision to the original list of abuses of discretion in consideration for bribes that the statute proscribes. Thus, as amended, the statute now prohibits payments to foreign officials not just to buy any act or decision, and not just to induce the doing or omitting of an official function "to assist...in obtaining or retaining business for or with, or directing business to, any person,"[62] but also the making of a payment to such a foreign official to secure an "improper advantage" that will assist in obtaining or retaining business.[63]

The district court concluded, and defendants argue on appeal, that merely by adding the "improper advantage" language to the two

---

[61] Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, Dec. 17, 1997, art. 1.1, S. Treaty Doc. No. 105-43, 37 I.L.M. 1, 4 (1998) (emphasis added).

[62] <u>See</u> 15 U.S.C. § 78dd-1(a)(1).

[63] <u>Id.</u>

existing kinds of prohibited acts acquired in consideration for bribes paid, Congress "again declined to amend the 'obtain or retain' business language in the FCPA."[64] In contrast, the government responds that Congress's choice to place the Convention language elsewhere merely shows that Congress already intended for the business nexus requirement to apply broadly, and thus declined to be redundant.

The Convention's broad prohibition of bribery of foreign officials likely includes the types of payments that comprise defendants' alleged conduct. The commentaries to the Convention explain that "'[o]ther improper advantage' refers to something to which the company concerned was not clearly entitled, for example, an operating permit for a factory which fails to meet the statutory requirements."[65] Unlawfully reducing the taxes and customs duties at issue here to a level substantially below that which ARI was legally obligated to pay surely constitutes "something [ARI] was not clearly entitled to," and was thus potentially an "improper advantage" under the Convention.

As we have demonstrated, the 1977 and 1988 legislative history already make clear that the business nexus requirement is not to be interpreted unduly narrowly. We therefore agree with the government

---

[64] Kay, 200 F. Supp. 2d at 686.

[65] Commentaries on the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 37 I.L.M. at 8 [hereinafter "Commentaries"].

that there really was no need for Congress to add "or other improper advantage" to the requirement.[66]  In fact, such an amendment might have inadvertently swept grease payments into the statutory ambit — or at least created new confusion as to whether these types of payments were prohibited — even though this category of payments was excluded by Congress in 1977 and remained excluded in 1988; and even though Congress showed no intention of adding this category when adopting its 1998 amendments.[67]  That the Convention, which the Senate ratified without reservation and Congress implemented, would also appear to prohibit the types of payments at issue in this case only bolsters our conclusion that the kind of conduct allegedly engaged in by defendants can be violative of the statute.[68]

---

[66] Although Congress intended to expand the scope of the FCPA in its implementation of the Convention, such expansion did not clearly implicate the business nexus element.  Obviously, Congress added "any improper advantage" to the quid pro quo requirement. Other ways in which Congress intended to expand FCPA coverage included: (1) amending the statute to apply to "any person," instead of the more limited category of issuers registered under the 1934 Act and domestic concerns; (2) expanding the definition of "foreign official" to include officials of public international organizations; and (3) extending the FCPA to cover "acts of U.S. businesses and nationals in furtherance of unlawful payments that take place wholly outside the United States."  S. Rep. No. 105-277, at 2-3.

[67] Even though the Commentaries to the Convention also excepted small facilitation payments from its scope, a change in the business nexus requirement to include "other improper advantage" still may have created undue confusion as to whether payments previously allowed were now prohibited by the statute, as the Convention's precise understanding of "facilitating payments" may ultimately differ with Congress's.

[68]  Indeed, given the United States's ratification and implementation of the Convention without any reservation,

35

## 4. **Summary**

Given the foregoing analysis of the statute's legislative history, we cannot hold as a matter of law that Congress meant to limit the FCPA's applicability to cover only bribes that lead directly to the award or renewal of contracts.  Instead, we hold that Congress intended for the FCPA to apply broadly to payments intended to assist the payor, either directly or indirectly, in obtaining or retaining business for some person, and that bribes paid to foreign tax officials to secure illegally reduced customs

---

understandings or alterations specifically pertaining to its scope, we would find it difficult to interpret the statute as narrowly as the defendants suggest:  Such a construction would likely create a conflict with our international treaty obligations, with which we presume Congress meant to comply fully.  See Restatement (Third) of Foreign Relations Law, § 115, cmt. a (1987) ("It is generally assumed that Congress does not intend to repudiate an international obligation of the United States by nullifying a rule of international law or an international agreement as domestic law, or by making it impossible for the United States to carry out its obligations.");  Boureslan v. Aramco, 857 F.2d 1014, 1023 (5th Cir. 1988) (King, J. dissenting) (recognizing the "presumption that Congress does not intend to violate international law").  We recognize that there may be some variation in scope between the Convention and the FCPA.  The FCPA prohibits payments inducing official action that "assist[s]...in obtaining or retaining business"; the Convention prohibits payments that induce official action "to obtain or retain business or other improper advantage in the conduct of international business." Potential variation exists because it is unclear whether the Convention's "other improper advantage in the conduct of international business" language requires a business nexus to the same extent as does the FCPA. This case, however, does not require us to address potential discrepancies (including whether they exist) between the scope of the Convention and the scope of the statute, i.e., payments that clearly fall outside of the FCPA but clearly fall within the Convention's prohibition or vice versa, because we have already concluded that the type of bribery engaged in by defendants has the potential of violating the statute.

36

and tax liability constitute a type of payment that can fall within this broad coverage. In 1977, Congress was motivated to prohibit rampant foreign bribery by domestic business entities, but nevertheless understood the pragmatic need to exclude innocuous grease payments from the scope of its proposals. The FCPA's legislative history instructs that Congress was concerned about both the kind of bribery that leads to discrete contractual arrangements and the kind that more generally helps a domestic payor obtain or retain business for some person in a foreign country; and that Congress was aware that this type includes illicit payments made to officials to obtain favorable but unlawful tax treatment.

Furthermore, by narrowly defining exceptions and affirmative defenses against a backdrop of broad applicability, Congress reaffirmed its intention for the statute to apply to payments that even indirectly assist in obtaining business or maintaining existing business operations in a foreign country. Finally, Congress's intention to implement the Convention, a treaty that indisputably prohibits any bribes that give an advantage to which a business entity is not fully entitled, further supports our determination of the extent of the FCPA's scope.

Thus, in diametric opposition to the district court, we conclude that bribes paid to foreign officials in consideration for unlawful evasion of customs duties and sales taxes could fall within the purview of the FCPA's proscription. We hasten to add, however, that this conduct does not automatically constitute a violation of

37

the FCPA: It still must be shown that the bribery was intended to produce an effect —— here, through tax savings —— that would "assist in obtaining or retaining business.

D.    **Sufficiency of the Indictment**

As in every indictment, the instant indictment's allegations must clearly inform the defense of what it is that the government intends to prove in satisfying each element of the crime, and must enable the defendant to assert double jeopardy and not be subject to prosecution for charges not presented to the grand jury.  Here, the question of sufficiency of the factual allegations centers on the business nexus element of the crime, viz., the producing-cause relationship between the substantial avoidance or evasion of duties and taxes and getting or keeping business in Haiti.  This, in turn, poses the question, what allegations of the indictment, if any, so inform the defendants of the government's intended proof of such linkage as to be sufficient for mounting a defense?[69]  Because the district court determined that the alleged bribes are of a type that can never be covered by the FCPA, that court never reached or addressed the sufficiency of the indictment vis-à-vis the business nexus element.  We shall do so now in an effort to assist the district court's proceedings on remand.

---

[69] See, e.g., United States v. Richards, 204 F.3d 177, 192 (5th Cir. 2000) (finding that an indictment was sufficient, despite the supposed failure to allege clearly the materiality element of the offense, because the facts alleged "warrant[ed] an inference that the false statements were material") (citation omitted).

38

We observe as a preliminary matter that this is the kind of case that a relatively few reported opinions have analyzed to determine whether an indictment that sets out the elements of the offense charged merely by tracking the words of the statute itself, is insufficient. Most reported opinions that have addressed this issue appear to approve the practice of tracking the statute as long as the words used expressly set out all of the elements necessary to constitute the offense.[70] The cases in which an indictment that parrots the statute is held to be insufficient turn on a determination that the factual information that is not alleged in the indictment goes to the very core of criminality under the statute.

The Supreme Court took this approach in Russell v. United States,[71] in which it found indictments defective because the allegations under 2 U.S.C. § 192, which prohibits witnesses before congressional committees from "refus[ing] to answer any question pertinent to the question under inquiry,"[72] failed to identify the "question under inquiry." The Court ruled that the "core of criminality" under the statute was the pertinency to the subject

---

[70] See, e.g., United States v. Davis, 336 F.3d 920, 922-24 (9th Cir. 2003); United States v. Akers, 215 F.3d 1089, 1101 (10th Cir. 2000); United States v. Monus, 128 F.3d 376, 388 (6th Cir. 1997); United States v. Cochran, 17 F.3d 56, 61 (3d Cir. 1994); United States v. Chandler, 996 F.2d 1073, 1097 (11th Cir. 1993); United States v. Young, 618 F.2d 1281, 1286 (8th Cir. 1980).

[71] 369 U.S. 749 (1962).

[72] Id. at 752 n.2.

under inquiry of the question a witness refused to answer.[73]  The

Court stated:

> Where guilt depends so crucially upon such a specific
> identification of fact, our cases have uniformly held
> that an indictment must do more than simply repeat the
> language of the criminal statute.[74]

The Court concluded that the indictments failed this test because,

even though they did list the questions that the defendants had

refused to answer, they failed totally to specify the topic under

inquiry, which was the key to the legality or illegality of the

defendants' acts.[75]  In short, the defendants faced trial with the

"chief issue undefined."[76]

The First Circuit, in United States v. Murphy,[77] followed

Russell to invalidate an indictment that charged the defendant with

threatening a particular witness to influence his testimony in an

official proceeding.  The indictment quoted the statute,[78] and

identified the threatened witnesses and the date of the threat.[79]

The indictment did not, however, identify any official proceeding.

In invalidating the indictment for that omission, the First Circuit

---

[73]  Id. at 764.

[74]  Id. at 771.

[75]  Id. at 765-68.

[76]  Id. at 766.

[77]  762 F.2d 1151 (1st Cir. 1985).

[78]  18 U.S.C. § 1512(a)(1).

[79]  Murphy, 762 F.2d at 1153.

concluded that the missing information went to the core of criminality under the statute. Without that information, reasoned the Murphy court, the defense did not know what proceeding the grand jury was charging the defendants with attempting to influence.[80]

United States v. Pirro[81] exemplifies the difficulties courts confront with this kind of issue. In that case, the indictment charged violations of Section 7206 of the Internal Revenue Code ("I.R.C."), which makes it a felony for "any person ... [to] [w]illfully make [] and subscribe [] any [tax] return ... which he does not believe to be true and correct as to every material matter."[82] The allegations were that the defendant, the company president who signed its tax return, failed to report another individual's "ownership interest" in the company on its tax return for a particular year, and also misstated his own ownership interest in that company on the return.[83] The Pirro majority concluded that the indictment was deficient in several respects, including its failure to charge a violation of a known legal right and its failure to allege the essential facts constituting the offense charged. In finding the indictment insufficient, the majority relied on the

---

[80] Id. at 1154-55 ("[T]he indictment was defective because it did not adequately apprise the defendants of the charges against them.").

[81] 212 F.3d 86 (2d Cir. 2000).

[82] 26 U.S.C. § 7206(1). See also Pirro, 212 F.3d at 97.

[83] Id. at 87-88.

Supreme Court's opinion in <u>Russell</u>.[84]  The flaw identified by the <u>Pirro</u> majority was the indictment's failure to allege what it was that made the omission from the tax return criminal.[85]  The allegation that the "ownership interest" of the chairman was not reported was found insufficient because the term "ownership interest" was <u>generic</u>, and no specifics were provided.  The statute — I.R.C. § 7206(1) — prohibits an omission only if there is a duty to report.[86]  The majority reasoned that because the term "ownership interest" is broader than "share ownership," and there was no duty to report the interest at issue, absent other shareholders, the government's allegation might (or might not) make the tax return incorrect and thus violative of the statute.[87]

The thrust of the vigorous dissent in <u>Pirro</u> was that the indictment did allege a crime and did so with sufficient specificity when it alleged that the defendant violated the law by failing to disclose identified ownership interests in the tax return.[88]  The dissent emphasized that indictments that do little more than track the language of the statute and state the time and place of the

---

[84]  <u>Id.</u> at 92–95.

[85]  <u>Id.</u> at 93.

[86]  <u>Id.</u>

[87]  <u>Id.</u> at 93–94.

[88]  <u>Id.</u> at 100–04.

42

alleged crime in proximate terms are sufficient.[89]  In <u>Pirro</u>, the indictment provided dates and times, tracked the statute, and alleged all the elements of the offense by tracking the statute. The dissent found that the definition of the offense did not include any "generic term" that required a "descen[t] to particulars," asserting that even without the added information that the defendant wanted, the parties knew the issues.[90]  Consequently, the dissent was satisfied that the indictment was sufficient, leaving for trial — not pretrial, on a scant record — the question whether the government could prove its case with sufficient evidence.[91]

Here, the issue can be phrased in a number of ways.  In <u>Russell</u>-like terms, the issue is whether the alleged <u>quid</u> <u>pro</u> <u>quo</u> of bribery-obtained reductions in sales taxes and customs duties has an "intent-to-assist" nexus to obtaining or retaining business in the foreign country.  As explained <u>ad</u> <u>nauseam</u> in the foregoing analysis of the legislative history of the FCPA, the "assist" nexus is indisputably the element of the crime that distinguishes it from garden-variety bribery on the broad end of the spectrum and bribery to obtain or retain a particular government contract on the narrow end.[92]  In terms of the sufficiency of the indictment, however, the

---

[89]  <u>Id.</u> at 92–93.

[90]  <u>Id.</u> at 93 (quoting <u>United States v. Cruikshank</u>, 92 U.S. 542 (1875)).

[91]  <u>Id.</u> at 105.

[92]  <u>See</u> <u>supra</u> at ___.

43

question is whether the business nexus element —— which in the instant indictment is merely a paraphrase of that part of the statute —— goes to the "core of criminality"[93] under the statute and contains generic terms, requiring more particularity. Stated differently, the question is whether the lack of detail in that part of the indictment that deals with this one element is more like an absence of detail as to how the crime was committed than a failure to specify what the crime was.

Obviously, an indictment does not have to set out evidence or details of how a crime was committed as long as it gives the defendant notice of what the government is charging.[94] Here, the question is whether the statutory prohibition against a bribe that "assists [the defendant] in obtaining and retaining business" for some person can properly be viewed as containing only "generic" terms, which demand more particularity in the indictment. Without more, the words "assists" and "business" are certainly candidates for classification as generic terms. There are innumerable ways and degrees of assisting; and —— as we have seen in conjunction with the FCPA's legislative history —— "business" is as broad as it is tall. True, there are many crimes that include nexus elements, such as effects on interstate commerce or use of the mails in connection

---

[93] Russell, 369 U.S. at 764.

[94] See, e.g., United States v. Ellender, 947 F.2d 748 (5th Cir. 1991) ("To comply with [Federal Rule of Criminal Procedure] 7(c), an indictment need not provide the evidentiary details of the government's case.") (citations omitted).

44

with a scheme to defraud, in which the nexus element cannot be said to go to the core of criminality. For such crimes, the courts appear to take the approach that those kinds of nexus elements can be alleged without factual detail and still not violate the Fifth or Sixth Amendments.

The line between deficient and sufficient factual detail in an indictment is not a bright one, particularly when, as here, the statute itself does not clearly define the offense. Although the instant indictment does allege in sufficient detail the linkage between the payment of bribes and the tax benefit obtained (quid pro quo), it does not detail any "assist" nexus between the tax benefit and getting or keeping business. Like the defendants, we are left to ask how the tax benefit was intended to assist in obtaining or retaining business, and what was the business or business opportunities sought to be obtained or retained? All that is known from the indictment is that the business involves rice imported into Haiti at below-legal tax and custom rates.

Although we recognize that lowering tax and customs payments presumptively increases a company's profit margin by reducing its cost of doing business, it does not follow, ipso facto, —— as the government contends —— that such a result satisfies the statutory business nexus element. Even a modest imagination can hypothesize myriad ways that an unwarranted reduction in duties and taxes in a large-volume rice import operation could assist in obtaining or retaining business. For example, it could, as already indicated,

45

so reduce the beneficiary's cost of doing business as to allow the beneficiary to underbid competitors for private commercial contracts, government allocations, and the like; or it could provide the margin of profit needed to fend off potential competition seeking to take business away from the beneficiary; or, it could make the difference between an operating loss and an operating profit, without which the beneficiary could not even stay in business; or it could free up funds to expend on legitimate lobbying or other influence-currying activities to favor the beneficiary's efforts to get, keep, or expand its share of the foreign business. Presumably, there are innumerable other hypothetical examples of how a significant diminution in duties and taxes could assist in getting or keeping particular business in Haiti; but that is not to say that such a diminution <u>always</u> assists in obtaining or retaining business. There are bound to be circumstances in which such a cost reduction does nothing other than increase the profitability of an already-profitable venture or ensure profitability of some start-up venture. Indeed, if the government is correct that anytime operating costs are reduced the beneficiary of such advantage is assisted in getting or keeping business, the FCPA's language that expresses the necessary element of assisting is obtaining or retaining business would be unnecessary, and thus surplusage — a conclusion that we are forbidden to reach.

If the business nexus element does go to the <u>core of criminality</u> of the FCPA, a criminal defendant cannot be left to read

the government's mind to determine what existing businesses or future business opportunities the government might, at trial, try to link causally with assistance provided by a lessened customs and tax burden. If business nexus is core, then in addition to alleging at least minimally sufficient facts that, if proved, will meet the other elements of a violation of the FCPA (such as the citizenship of the briber, the identity of the qualified business entity, the particular instrumentalities of foreign and interstate commerce employed, the identity of the foreign country and of the officials to whom the suspect payments are made, and the sought-after unlawful actions taken or not taken by the foreign official in consideration of the bribes), a sufficient FCPA indictment would also have to allege facts that at least minimally put the defense on notice of what business transactions or opportunities were purportedly sought to be obtained or retained, and how the results of the foreign official's unlawful acts were meant to "assist" in getting or keeping such business. In other words, if the business nexus element goes to the core of the FCPA's criminality, the indictment would have to allege facts that, if proved, would establish an intended causal assistance link between the illicit benefit of reduced taxes and duties and the obtaining or retaining of the business venture or activity thus identified.

As noted at the outset of this opinion, the indictment contains no such specific allegations. Except for closely paraphrasing the objective "purpose" language of the statute regarding the aim of the

47

bribe being to produce some conduct by a foreign official, the results of which (quid pro quo) will assist in obtaining or retaining foreign business for some person (business nexus), the indictment alleges nothing whatsoever about (1) the nature of the assistance purportedly intended or produced by the lowered taxes, (2) the identity of the particular business or business opportunity the obtaining or retaining of which was being sought, or (3) the way (nexus) such assistance was supposed to help get or keep such business or opportunity.[95]  As such, the indictment's sufficiency hinges on a determination whether the business nexus element of the crime is core.[96]

---

[95] The potential lacuna in the instant indictment is distinguishable from the failure of the indictment clearly to allege the element of materiality in Richards, in which we found the indictment sufficient because the other facts alleged in it "warrant[ed] an inference that the false statements were material." 204 F.3d at 192.  Except for the overbroad, generic reference to the rice business, no combination of facts here alleged in the indictment allow an inference of what business was purportedly obtained or retained or how the illicit tax savings produced by the bribery were intended to assist ARI or RCH in obtaining or retaining it.

[96] On appeal, as in the district court, defendants advance alternative bases for holding the indictment insufficient.  One such defense was grounded in the rule of lenity in the face of the statute's ambiguity, and another was grounded in the fair-warning requirement of the Due Process Clause in the face of the dearth of case law on the subject.  As today we reverse the district court's dismissal of the indictment as insufficient and remand for further proceedings which might include a requirement that the government be more specific regarding the business nexus element, we do not address these alternative propositions.  They can, however, be addressed for the first time by the district court on remand.

We conclude that, as important to the statute as the business nexus element is, it does not go to the FCPA's core of criminality. When the FCPA is read as a whole, its core of criminality is seen to be bribery of a foreign official to induce him to perform an official duty in a corrupt manner. The business nexus element serves to delimit the scope of the FCPA by eschewing applicability to those bribes of foreign officials that are not intended to assist in getting or keeping business, just as the "grease" provisions eschew applicability of the FCPA to payments to foreign officials to cut through bureaucratic red tape and thereby facilitate matters. Therefore, the indictment's paraphrasing of the FCPA's business nexus element passes the test for sufficiency, despite alleging no details regarding what business is sought or how the results of the bribery are meant to assist, passes the test for sufficiency.

### III. CONCLUSION

We cannot credit the district court's per se ruling that the fiscal benefits of the mal-administration of foreign revenue laws by foreign officials in consideration for illicit payments by United States businessmen or business entities can never come within the scope of the FCPA. Just as bribes to obtain such illicit tax benefits do not ipso facto fall outside the scope of the FCPA, however, neither are they per se included within its scope. We are satisfied that — for purposes of the statutory provisions criminalizing payments designed to induce foreign officials

49

unlawfully to perform their official duties in <u>administering</u> the laws and regulations of their country to produce a result intended to assist in obtaining or retaining business in that country —— an unjustified reduction in duties and taxes can, under appropriate circumstances, come within the scope of the statute.

As the district court held the indictment insufficient based on its determination that the kind of bribery charged in the indictment does not come within the scope of the FCPA, that court never reached the question whether the indictment was sufficient as to the business nexus element of the crime, for which the charging instrument merely tracked the statute without alleging any discrete facts whatsoever. As we conclude that the business nexus element of the FCPA does not go to the core of criminality of that statute, we hold that the indictment in this case is sufficient as a matter of law. For the foregoing reasons, therefore, the judgment of the district court dismissing the indictment charging defendants with violations of the FCPA is reversed and the case is remanded for further proceedings consistent herewith.

REVERSED and REMANDED.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. H-01-914 S |
|  | ) |  |
| v. | ) | 15 U.S.C. §§ 78dd-1(a), 78dd-2(a) |
|  | ) | (Foreign Corrupt Practices Act) |
| DAVID KAY, | ) |  |
|  | ) |  |
| and | ) |  |
|  | ) |  |
| DOUGLAS MURPHY, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

SUPERSEDING INDICTMENT

The Grand Jury charges that:

GENERAL ALLEGATIONS

1. At all times material to this Indictment, the Foreign Corrupt Practices Act of 1977 (FCPA), as amended, 15 U.S.C. §§78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for United States persons, businesses and residents to use the United States mails, or any means or instrumentality of interstate or foreign commerce in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person.

2. At all times material to this Indictment:

    a. American Rice, Inc. ("ARI") was a business incorporated under the laws of the State of Texas, and having its principal place of business in Houston, Texas. American Rice, Inc. had a class of securities registered pursuant to Section 15 of the Securities

51

*32*

Exchange Act of 1934 (15 U.S.C. § 78o) and was required to file reports with the U.S. Securities & Exchange Commission under Section 12 of the Securities Exchange Act (15 U.S.C. § 78*l*). As such, American Rice, Inc. was an "issuer" within the meaning of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1.

b.    Rice Corporation of Haiti ("RCH") was a subsidiary of defendant American Rice, Inc. that was incorporated in the Republic of Haiti. RCH was formed to act as a "service corporation" to represent American Rice, Inc.'s interest in Haiti. At all times prior to September 1999, American Rice, Inc. controlled all of RCH's actions, paid all of RCH's expenses, employed all of RCH's management, retained title to all rice imported by RCH until sold to third parties and consolidated its financial statements with those of American Rice, Inc.

c.    Defendant DAVID KAY was an American citizen and a vice-president for marketing of American Rice, Inc. who was responsible for supervising sales and marketing in Haiti. As such, KAY was an officer of an "issuer" and a "domestic concern" within the meaning of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, 78dd-2.

d.    Defendant DOUGLAS MURPHY was an American citizen and president of American Rice, Inc. As such, MURPHY was an officer of an "issuer" and a "domestic concern" within the meaning of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, 78dd-2.

3.    Beginning in or about 1995 and continuing to in or about August 1999, defendants KAY and MURPHY and other employees and officers of American Rice, Inc. paid bribes and authorized the payment of bribes to induce customs officials in the Republic of Haiti to

-2-

52

accept bills of lading and other documents which intentionally understated the true amount of rice that ARI shipped to Haiti for import, thus reducing the customs duties owed by American Rice, Inc. and RCH to the Haitian government.

4. In addition, beginning in or about 1998 and continuing to in or about August 1999, defendant KAY and other employees and officers of American Rice, Inc. paid and authorized additional bribes to officials of other Haitian agencies to accept the false import documents and other documents which understated the true amount of rice being imported into and sold in Haiti, thereby reducing the amount of sales taxes paid by RCH to the Haitian government.

5. In furtherance of these bribes, defendant KAY directed employees of American Rice, Inc. to prepare two sets of shipping documents for each shipment of rice to Haiti, one that accurately reflected and another that falsely represented the weight and value of the rice being exported to Haiti.

6. In furtherance of these bribes, defendants KAY and MURPHY, acting on his own behalf and as an agent of American Rice, Inc., agreed to pay and authorized the payment of bribes, calculated as a percentage of the value of the rice not reported on the false documents or in the form of a monthly retainer, to customs and tax officials of the Haitian government to induce these officials to accept the false documentation and to assess significantly lower customs duties and sales taxes than American Rice, Inc. would otherwise have been required to pay.

7. In furtherance of these bribes, defendants KAY and MURPHY authorized employees of American Rice, Inc. to withdraw funds from American Rice, Inc. bank accounts and to pay

-3-

53

these funds to officials of the Haitian government, either directly or through intermediary brokers.

8. As a result of the bribes and the Haitian officials' acceptance of the false shipping documents, American Rice, Inc. reported only approximately 66% of the rice it actually imported into Haiti between January 1998 and August 1999 and thereby significantly reduced the amount of customs duties it was required to pay to the Haitian government.

9. As a further result of these bribes, American Rice, Inc., using official Haitian Customs documents reflecting the amounts reported on the false shipping documents, reported only approximately 66% of the rice it sold in Haiti and thereby significantly reduced the amount of sales taxes it was required to pay to the Haitian government.

## COUNTS ONE - TWELVE

## FOREIGN CORRUPT PRACTICES ACT (15 U.S.C. §78dd-1))

10. The grand jury incorporates by reference the allegations set forth in paragraphs 1-9 above and charges that:

11. On or about the dates set forth below, in the Southern District of Texas and elsewhere, defendants DAVID KAY and DOUGLAS MURPHY, domestic concerns and officers of American Rice, Inc., an "issuer" within the meaning of the Foreign Corrupt Practices Act, did use and cause to be used instrumentalities of interstate and foreign commerce, to wit, an overnight express service, facsimile transmissions, and an ocean-going barge, which were used to transport and transmit false shipping documents, corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of money to foreign officials, to

-4-

54

wit, customs officials of the Government of the Republic of Haiti, directly and through third persons, for purposes of influencing acts and decisions of such foreign officials in their official capacities, inducing such foreign officials to do and omit to do acts in violation of their lawful duty, and to obtain an improper advantage, in order to assist American Rice, Inc. in obtaining and retaining business for, and directing business to, American Rice, Inc. and Rice Corporation of Haiti.

| COUNT | DATE | BARGE |
|-------|------|-------|
| 1 | January 6, 1998 | *LaurieKristie* |
| 2 | February 20, 1998 | *Balsa 51* |
| 3 | April 20, 1998 | *LaurieKristie* |
| 4 | June 4, 1998 | *LaurieKristie* |
| 5 | June 27, 1998 | *LaurieKristie* |
| 6 | October 7, 1998 | *LaurieKristie* |
| 7 | December 7, 1998 | *LaurieKristie* |
| 8 | February 16, 1999 | *LaurieKristie* |
| 9 | April 14, 1999 | *LaurieKristie* |
| 10 | May 27, 1999 | *LaurieKristie* |
| 11 | June 30, 1999 | *LaurieKristie* |
| 12 | August 3, 1999 | *Blumarlin* |

All in violation of Title 15, United States Code, Sections 78dd-1(a) and 78dd-2(a), and Title 18, United States Code, Section 2.

-5-

55

A TRUE BILL:

Date:  Houston, Texas
      March 25, 2002

                                   Foreperson

     MICHAEL T. SHELBY                  JOSHUA R. HOCHBERG
     United States Attorney             Chief, Fraud Section
     Southern District of Texas         Criminal Division
                                   United States Department of Justice

PETER B. CLARK
Deputy Chief

PHILIP UROFSKY
Senior Trial Attorney

CLIFFORD I. RONES
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue
Washington, D.C. 20005
(202) 514-3910

-6-