# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2023

Lyle W. Cayce
Clerk

No. 22-30357

─────────────

United States of America,

*Plaintiff—Appellee*,

*versus*

William E. Holdman,

*Defendant—Appellant*.

───────────────────────────────

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:21-CR-259-1

───────────────────────────────

Before Wiener, Southwick, and Duncan, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

A magistrate judge found the defendant guilty of aiding and abetting others in hunting over bait and hunting over a baited area, both in violation of the Migratory Bird Treaty Act. The district court affirmed the conviction, fine, and one-year term of probation. We also AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

William E. Holdman is a deer farmer in Louisiana. He has been an avid hunter since he was a child and is about 70-years old today. The

following comes from testimony in the bench trial that was held regarding the charges against Holdman.

Holdman is the owner and operator of a 1,200-acre deer farm called Elam Woods Whitetails. The farm is comprised of two operations that are separately licensed and regulated through the Louisiana Department of Agriculture. Holdman operates a wildlife preserve of over 250 acres and a 55-acre deer breeding facility. In order to breed profitably, Holdman testified that he enhances the deer's genetics through nutrition consisting of "green material," which allows the deer's digestive system to work optimally. The green material consists of "fresh leaves or fodder or hay." Holdman plants and harvests fodder — "the new growth off of a seed" that contains the most nutrition — continuously throughout the year. Holdman distributes seeds at a rate of approximately 120 pounds per acre, and depending on moisture conditions at the time of planting, the seeds will begin to germinate after five to seven to ten days. According to Holdman, he "broadcast[ed]," or mechanically scattered, wheat seed on August 17, 2018.

In Louisiana in 2018, mourning dove hunting season began on September 1. Two weeks before then, agents from the Louisiana Department of Wildlife and Fisheries ("LDWF") were flying a plane overhead, searching for illegal baiting setups as the dove season approached. LDWF Sergeant Kirk Hatten testified that planting seed prior to the Louisiana state recommendations for planting is indicative of a baited field.

Sergeant Hatten, and other LDWF agents, walked onto Holdman's property to investigate what they suspected to be a baited area after the aerial surveillance. The agents observed recently mown grass and broadcasted seeds along the gravel road leading to the freshly disced field. In the field, agents saw wheat seed broadcasted across the freshly disced area. The wheat seed was uncovered and exposed on the top of the ground, referred to as

"top-sown."    That ran counter to the state's extension service's recommendations for growing wheat.

Agents also discovered a thicket-like brush area in the middle of the tilled field, directly across from an artificial power line.  Prior to leaving the area, agents collected samples of the wheat seed, took photographs of the brush-hide, and set up a "PlotWatcher" camera to monitor ongoing activity.  On August 29, agents returned to Holdman's field.  After inspecting the field and reviewing the footage from the PlotWatcher, agents noticed Holdman had broadcasted more wheat seed, which was again left exposed.

On September 1, opening day for dove season, agents returned to Holdman's deer farm and watched Holdman and two others during their hunt.  After the men finished their hunt, Sergeant Hatten approached Holdman and confronted him with the PlotWatcher evidence of baiting his field.  When Holdman stated he was growing a food plot to attract deer, Sergeant Hatten inquired why he had not covered the seed, to which Holdman responded that he was waiting on rain to cover the seed.  Holdman admitted that he hoped the doves would land on his artificial power line and "get a bite of wheat."

Regulations promulgated under the Migratory Bird Treaty Act ("MBTA") offer a limited safe harbor provision, which states that seed or grain scattered "solely as the result of a normal agricultural operation" does not make a field a "baited area."  50 C.F.R. § 20.21(i)(2). Dr. Donald P. Reed, professor emeritus at the Louisiana State University ("LSU") Agricultural Center and a wildlife extension specialist, testified that the regulations specify that broadcasting is part of a "normal agricultural operation" *only* if the farming activity complies with the official recommendations of State Extension Specialists working at a U.S. Department of Agriculture-recognized Cooperative Extension Service

Program for the state in which the food plot is located. That means a state-run agricultural guidance program operated out of the agricultural departments of public land-grant colleges and universities is tasked with providing agricultural advice and outreach within that state regarding accepted best practices. Louisiana's Cooperative Extension Service is run out of the LSU Agricultural Center, and the Louisiana extension service has issued comprehensive guidance on wheat field "food plot" planting in the state of Louisiana in three pamphlets: (1) "Managing Agricultural Areas for Migratory Bird Hunting," (2) "Crops for Wildlife Plantings, Recommendations, Establishment and Management," and (3) "Food Plot Plantings for White-Tailed Deer in Louisiana."

Dr. Reed, who authored or co-authored all three pamphlets, testified that Holdman failed to follow the recommended guidelines for normal agricultural procedures in these ways: (1) he scattered the winter wheat seed prior to the recommended date of September 1, (2) he left the seed uncovered rather than using one inch of soil cover, and (3) he distributed the seed too densely, 120 pounds of seed per acre rather than the recommended 80 pounds of seed per acre. After reviewing images of the area, including the artificial power line and brush hide, Dr. Reed opined that Holdman's field was not in line with Louisiana's Cooperative Extension Service guidelines for a wheat field and, therefore, fell outside the MBTA regulations' definition of a "normal agricultural operation."

During cross-examination of Dr. Reed, Holdman's counsel introduced a one-page summary chart of *Mississippi's* Cooperative Extension Service guidance, titled "Wildlife Food Plot Planting Guide for the Southeast." This summary chart, issued by Mississippi State University's extension program, recommended (1) a planting date range of August 15 to October 15, and (2) a broadcast density up to 120 pounds of seed per acre for wheat field planting in the Southeast. The Government later informed the

district court that Holdman had not introduced the complete Mississippi State Extension Service guidance.[1]

During his testimony, contrary to what he told Sergeant Hatten, Holdman asserted he never intended to cover the seeds because he wanted to let the exposed seeds germinate before feeding it to his deer. Holdman admitted he installed the artificial power line as an attractive perch for birds and admitted to hunting several types of birds off it "all the time." Holdman did not testify that he relied on guidance from any extension service.

During closing arguments, defense counsel asserted that despite Holdman's intent to hunt birds over the seeded field, the field was not an illegal baited area because Holdman's actions met the MBTA's definition of a normal agricultural operation. According to defense counsel, although Holdman did not follow the guidelines promulgated by the Louisiana State Extension Service, the MBTA's safe harbor provision was applicable because the Mississippi State Extension Service guidance purported to cover the Southeast, generally.

The magistrate judge rejected Holdman's arguments, concluding that guidance from the Louisiana State Extension Service was applicable to Holdman's deer farm located in Louisiana. Further, even if the Mississippi State guidance was applicable, it did not benefit Holdman because he did not

---

[1] According to the Government, the complete Mississippi Cooperative Extension Service guidance also advised that wheat seed should be covered by at least one inch of soil. *See* Bill Hamrick & Bronson Strickland, *Supplemental Wildlife Food Planting Manual for the Southeast*, *in* Mississippi State University Extension Service, at 17 (2011 2d Ed.), *available at* http://extension.msstate.edu/sites/default/files/publications/publications/ P2111_web.pdf. It does not appear, however, that the complete guidance was properly introduced into the record, and nothing in the record definitively states the Mississippi Cooperative Extension Service's guidance on soil cover. Ultimately, we conclude that Mississippi's Cooperative Extension service recommendations are inapplicable.

follow the normally accepted practice of placing one inch of soil over the seeds.

The magistrate judge found Holdman guilty of (1) aiding and abetting others in hunting over bait and (2) hunting over a baited area, in violation of the MBTA, codified at 16 U.S.C. §§ 703 and 704.  Holdman was ordered to pay a special assessment of $20 and a fine of $1,500.  In addition, the magistrate judge imposed a one-year term of probation, with a special condition of no hunting of migratory birds as defined in 50 C.F.R. § 20.11.

Holdman filed a timely appeal to the district court challenging the judgment.  Holdman asserted this case was one of statutory interpretation and argued the magistrate judge erred in concluding: (1) that each farm is covered by the extension services in the state in which it is located; (2) that seeds must be covered with soil in order to constitute action in accordance with a normal agricultural operation; and (3) that the Government had met its burden of proof in light of the evidence and the "proper" interpretation of 50 C.F.R. § 20.11(h).

After a *de novo* review, the district court affirmed.  The district court noted that the "critical issue" on appeal was whether the field "was planted solely as the result of normal agricultural operations and, in turn, what the guidelines constituting a normal agricultural operation are."  It concluded Holdman was guilty of hunting over a baited field and no exception for a "normal agricultural operation" applied.  The district court further concluded that, in order to hunt over the field and avail himself of the safe harbor provision, Holdman had to follow the guidelines of his own state's Cooperative Extension Services and that he "did not follow a single recommendation from the Extension Service Department of Louisiana."

Holdman timely filed a notice of appeal to this court.

No. 22-30357

## DISCUSSION

We first explain why a magistrate judge conducted the trial without the agreement of the parties or other common predicate. *See*, *e.g.*, 28 U.S.C. § 636(c). Section 636(a)(3) & (4) grants magistrate judges the authority to conduct trials under 18 U.S.C. § 3401 and to sentence for petty offenses. Section 3401(a) states that, when authorized by the district court, a magistrate judge may "try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district." An appeal then can be taken to the district court. 18 U.S.C. § 3402. Those statutes were employed here.

Holdman first argues it was legal error to conclude that relevant guidance for the safe harbor provision must be provided by the extension service in the state where the property is located. Second, he argues it was legal error to conclude that a normal agricultural operation required the seeds to be covered, regardless of whether the state extension service made such a recommendation. Third, Holdman argues the Government did not provide sufficient evidence to sustain its burden of proof. Finally, Holdman asserts the district court erred in concluding that, in addition to being *objectively* intended for exclusively agricultural uses, a planted field must also be *subjectively* intended for exclusive agricultural purposes.

Although Holdman has organized his arguments into four separate issues, he essentially argues the evidence was insufficient to sustain his conviction, mainly because the applicable statutes and regulations were misinterpreted. Principally, Holdman argues the MBTA and accompanying regulations allow him to use Mississippi's Cooperative Extension Service guidance for the Southeast region, rather than the guidance issued by Louisiana's Extension Service, to take advantage of the MBTA's safe harbor provision.

7

Questions of statutory interpretation are reviewed *de novo*. *See United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004). When a case is tried before a magistrate judge and affirmed by the district court on appeal, "we will affirm the magistrate's findings if they are supported by substantial evidence." *United States v. Lee*, 217 F.3d 284, 288 (5th Cir. 2000). "Evidence is sufficient to support a conviction if any rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt." *United States v. Morgan*, 311 F.3d 611, 613 (5th Cir. 2002) (quotation marks and citation omitted). We may affirm on any basis supported by the record. *See United States v. Jackson*, 453 F.3d 302, 308 n.11 (5th Cir. 2006).

### A.     *Background of extension services*

In light of the legal argument that the guidance relevant to Holdman's actions could come from Mississippi's Extension Service — even though the alleged offense occurred in Louisiana — we give some background on the cooperative extension service programs. That will explain the reach of a state's guidance for what constitutes the baiting of a field.

The place to start for understanding extension services as they exist today is in 1862, when President Abraham Lincoln signed into law the first Morill Act. The Act created the land-grant college system, which was a system of colleges "designed to promote agricultural and scientific knowledge," and these schools "appealed to a demographic that had been ignored by the seemingly elitist professional-centric universities at the time." Michael T. Olexa *et al.*, *Limitations to Statewide Reach of Land Grant Universities – Florida As A Cautionary Tale*, 25 DRAKE J. AGRIC. L. 323, 332 (2020). This article discusses other enactments relevant to understanding the overall history, but we will mention only one.

In 1914, the Smith-Lever Act "established cooperative extension programs at each of the land grant colleges," the purpose of which was "to

pass on information harbored within the land grant colleges and experiment stations." *Id.* at 337.  The Act provided for

> the "development of practical applications of research knowledge and giving of instruction and practical demonstration of existing or improved practices or technologies in agriculture . . . , home economics, and rural energy" to those people not attending one of the state land grant colleges.  The Act was premised on a cooperative extension model, establishing a partnership between the land grant colleges and the United States Department of Agriculture (USDA), whereby there would be mutual agreement by both parties on how to conduct the process.

*Id.* at 342 (quoting 7 U.S.C. § 342 (1914)) (alterations in original).  Each state would choose one of its land-grant schools to allocate the federal funds to its extension program.  *Id.*  Through this cooperative extension model framework, "land grant colleges would spread their impact across *every county of the state in which they were located.*"  *Id.* (emphasis added).

In summary, each state had one or sometimes two land-grant colleges.  Each state also had a "Cooperative Extension Service" operating out of public land-grant colleges and universities, with the purpose of researching and providing guidance to citizens regarding, among other areas, the best agricultural practices.  *See* 7 U.S.C. § 341.

Holdman's insistence that the applicable guidance for how he used his land in Louisiana could come from the Mississippi State Extension Service is contrary to the purpose and authority of each state's extension service.  A state's Cooperative Extension Service disseminates recommendations that govern *specific* planting, harvesting, and other normal agricultural practices for the state.  *See* 50 C.F.R. § 20.11(h).  Though we see no prohibition on an extension service publishing or otherwise providing advice that it describes as being applicable to the region in which that state is located, we reject the

conclusion that such advice would create a safe harbor for someone following it. We explain that conclusion next.

### B.    *The MBTA and baiting*

It is generally unlawful to kill any migratory bird. 16 U.S.C. § 703(a). "Migratory game birds" are defined as "those migratory birds included in the terms of conventions between the United States and any foreign country for the protection of migratory birds, for which open seasons are prescribed," which includes mourning doves. 50 C.F.R. § 20.11(a)(2). It is unlawful for a person to "take any migratory game bird by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area." 16 U.S.C. § 704(b)(1). Regulations promulgated by the U.S. Fish and Wildlife Service define a "[b]aited area" as "any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them." 50 C.F.R. § 20.11(j).

The limited safe harbor provision under the MBTA states that "[t]he taking of any migratory game bird" is not prohibited "over lands or areas that are not otherwise baited areas, and where grain or other feed has been distributed or scattered *solely* as the result of . . . a normal agricultural operation." *Id.* § 20.21(i)(2) (emphasis added). A "[n]ormal agricultural operation" is defined as "a normal agricultural planting, harvesting, post-harvest manipulation, or agricultural practice, that is conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture." *Id.* § 20.11(h).

Holdman does not contest the conclusion that he hunted and killed migratory birds, *i.e.*, doves, over a field scattered with winter wheat in

violation of Section 703(a).  The question remains, however, whether his field was cultivated in the course of *normal* agricultural operations and, thus, was not a baited area under the safe harbor exception.

Holdman first argues the magistrate judge erred in concluding that guidance was limited to the state extension specialists within his state of Louisiana, asserting that "State," as used in 50 C.F.R. § 20.11(h), is defined as *any* state within the union.  He further asserts that the plain language of "normal agricultural operation" does not include any location-specific restrictions.  According to Holdman, the magistrate judge's interpretation of the regulations is (1) contrary to the rule of lenity; (2) not supported by case law; and (3) contrary to the purpose of the state extension services, which is to disseminate information to the public.

We discuss the rule of lenity first.  When interpreting statutory language, words are given their ordinary, plain meanings, and the language must be enforced unless it is ambiguous.  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).  The Government argues Holdman is taking words out of context and is not interpreting the most meaningful phrase, "State Extension Specialists."  Both the magistrate judge and the district court concluded that guidance from "state extension specialists" was state-specific.  "Statutory language has meaning only in context."  *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 415 (2005).  We see the context as being a state-by-state system of extension services, tied to the state-by-state system of land-grant colleges and universities.

The regulation at issue is not ambiguous. The guidance from the state of Louisiana is the only relevant guidance.  The rule of lenity is inapplicable.

The question then becomes whether Holdman is entitled to a safe harbor for his actions because his conduct constituted "normal agricultural

operations." *See* 50 C.F.R. § 20.21(i)(2). The evidence is that Holdman's field was located near a clean water source, contained an artificial power line whose sole purpose was to attract birds, and also contained a brush area serving as a hunter's hide. These improvements to the field are not dispositive nor are they themselves illegal, but we must look at the evidence objectively. Holdman admitted to LDWF agents that he did not have a normal agricultural practice because he was trying to grow big deer and, further, that he knew the artificial power line would attract doves, that in turn might be attracted to the water source and the seeds.

The safe harbor exemption found in Section 20.21(i)(1) is only applicable where feed has been distributed "*solely* as the result of a normal agricultural operation." *Id.* § 20.21(i)(2) (emphasis added). Holdman does not challenge the extraneous improvements evidence and, instead, argues only that the Government made its case based on outdated guidance from Dr. Reed and did not look to Mississippi's extension service recommendations that Holdman's planting allegedly followed. Because we hold that the Cooperative Extension Service and State Extension Specialists' guidance is state-specific, we find no error in the Government's use of the LSU Extension's recommendations.

Holdman also asserts that the district court made its ruling based on subjective evidence. To the contrary, the district court stated that an objective test must be used to determine what constitutes a "normal agricultural operation." Here, the objective evidence reveals that Holdman scattered the seeds, at least in part, to attract doves, particularly given that there was a greater concentration of seeds around the artificial power line. The reason for scattering the seeds *would be* immaterial if Holdman had done so in accordance with the recommendations of the Louisiana State Extension Specialists, but he did not. He instead scattered more seed per acre than permitted and did not cover the seed with an inch of soil as required by the

Louisiana recommendations. He cannot, therefore, establish that his planting was conducted in a manner consistent with normal agricultural operations for the state of Louisiana.

As a belt-and-suspenders issue, we address Holdman's final argument that the district court misinterpreted the word "solely," asserting that the safe harbor provision does not require seeds to be planted solely for agricultural purposes but, instead, solely in accordance with a normal agricultural operation. The regulation provides that the seeding or planting must be done "solely *as the result* of a normal agricultural operation," *Id.* (emphasis added), not "in accordance with" a normal agricultural operation. This suggests plainly that the planting must be *a result* of a normal agricultural operation in order for the regulation to be applicable. Support for the district court's interpretation of "solely" is found in the fact that the definition of a "normal agricultural operation" already requires that the planting be "conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture." *Id.* § 20.11(h); *see also United States v. Webb*, No. 13–PO–0417, 2013 WL 5935223, at *4 (W.D. La. Nov. 4, 2013).

Holdman illegally baited his field in the hopes of a big hunt and then attempted to craft an after-the-fact argument for why this should fit within the realm of normal agricultural operations. The Cooperative Extension Service's recommendations are state-specific. Though we give credit to Holdman's creativity, we cannot find in his favor.

AFFIRMED.