FILED
United States Court of Appeals
Tenth Circuit

July 9, 2024

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee | |
| v. | No. 23-5049 |
| ALEXANDER NICHOLAUS SWEET, a/k/a Alexander Nicholas Sweet, | |
| Defendant - Appellant. | |

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:21-CR-00340-JFH-1)**
_____

Leah D. Yaffe, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Thomas E. Duncombe, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.
_____

Before **PHILLIPS**, **KELLY**, and **FEDERICO**, Circuit Judges.
_____

**FEDERICO**, Circuit Judge.
_____

In September 2019, when he was 26 years old, Alexander Sweet initiated online communications with M.L.C., a 15-year-old girl. Following months of online chatting, M.L.C. shared sexually explicit photos with Sweet. They also discussed sexually explicit topics over the phone and engaged in sexual activities together over a video chatting platform, during which Sweet took screenshots. Eventually, they met in person in their shared hometown of Tulsa, Oklahoma, and began an intimate relationship. During their relationship, when M.L.C. was 16, they recorded several videos of themselves engaging in sexual intercourse. M.L.C. also ran away from home to be with Sweet. On her second runaway attempt, they tried to get married. While they were on the run, Sweet was found with M.L.C. and arrested by the FBI, with "Just Married" painted on the rear of his car.

Sweet was charged, tried, and convicted by a jury on seven counts: coercion and enticement of a minor (Count One), production of child pornography (Counts Two, Five, Six, and Seven), receipt and distribution of child pornography (Count Three), and possession of child pornography (Count Four). The district court sentenced him (with all sentences to run concurrently) to:

- Count One: life imprisonment;
- Counts Two, Five, Six, and Seven: 30 years for each;
- Count Three: 20 years; and

- Count Four: 10 years.

Following the entry of judgment, Sweet directly and timely appeals. He raises four errors on appeal. First, he argues that the enticement[1] charge in the superseding indictment was insufficient because it did not provide adequate notice of the facts underlying the charged crime. Second, he argues the district court violated Federal Rule of Evidence 605 by defining the term "grooming" in a jury instruction.[2] Third, he claims the prosecution committed misconduct by making plainly improper comments during closing arguments that prejudiced him. Finally, Sweet argues the cumulative error doctrine should be applied to grant him a new trial.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

# I

M.L.C. had a tumultuous early childhood as both of her biological parents were absent from her life. In November 2006, when she was two years old, M.L.C. and her two siblings were discovered abandoned at a drug dealer's

---

[1] We use "entice" as shorthand for the four verbs, i.e., persuade, induce, entice, and coerce, listed in 18 U.S.C. § 2422(b).

[2] This argument has since been foreclosed by our opinion in *United States v. Flechs*, 98 F.4th 1235, 1250–54 (10th Cir. 2024). Sweet conceded this point in his response to the Government's Federal Rule of Appellate Procedure 28(j) letter, which highlighted *Flechs'* relevance to this appeal, and at oral argument, thus removing this issue from the appeal.

house, where their biological mother had left them for a week. M.L.C.'s aunt and her husband were approached by another family member and agreed to take the children in to prevent them from entering the foster care system. They adopted M.L.C. and her siblings, and, from then on, M.L.C. viewed them as her parents.

In September 2019, when M.L.C. was 15 and Sweet was 26, Sweet initiated contact with M.L.C. by direct messaging her on Instagram to inform her that an ex-boyfriend had posted a nude image of her on the ex-boyfriend's Instagram. Sweet included a pixelated screenshot of the nude image with his initial message. Before this, M.L.C. and Sweet had never interacted. At the time, her Instagram biography indicated she was in the tenth grade. About a week or two later, M.L.C. became aware that Sweet was 26 years old.

In early 2020, when M.L.C. was 15 going on 16, she experienced the deaths of two close family members. First, her grandfather, who had been battling pancreatic cancer for several years, passed away in January 2020. And only a few weeks later, her adoptive father took his own life. Around December 2019, Sweet reached out to M.L.C. with an uplifting message after coming across a public post on her Instagram about her ailing grandfather before his passing. From there, their online friendship quickly progressed, and they frequently discussed "animals, church, [and] family." R.I at 721–22.

4

A few months after they started communicating, M.L.C., now 16, began sending Sweet sexually explicit photos of herself after having developed a romantic interest in him. Sweet indicated that he enjoyed receiving the images. The two also engaged in sexually explicit conversations over the phone and on Google Hangouts, a video chatting platform, where they masturbated simultaneously on camera. Sweet took screen captures of their video chats and informed M.L.C. that he had sent them to a friend of his.

In September 2020, following a six-to-eight-month period of little to no contact, M.L.C. messaged Sweet to ask if he wanted to have a baby with her. This rekindled their relationship, leading to their first in-person meeting in mid-September 2020 in Tulsa, after which they began dating.

In November 2020, M.L.C. ran away, causing her adoptive mother to notify the police and initiate a search. M.L.C. had been picked up by one of her cousins and joined a convoy that included her cousin's vehicle and Sweet's vehicle, meeting up with Sweet as they all traveled to Arkansas. Ultimately, M.L.C.'s adoptive mother retrieved her from Arkansas in December 2020. This is when the FBI received a tip that Sweet was in an intimate relationship with a 16-year-old female and that he was in possession of graphic sexual material of her.

Upon learning of M.L.C. and Sweet's relationship, which she had previously been unaware of, M.L.C.'s adoptive mother grounded M.L.C.,

confiscated her phone, and forbade her from contacting Sweet. Her adoptive mother also took steps to keep Sweet away from M.L.C., including warning Sweet to stay away from her and, in December 2020, attempting to obtain a protective order against him. Although some form of the protective order was pending, in place, or periodically extended until June 2021, it was not continuously enforceable because Sweet was never formally served.

In March 2021, after a period of no contact, M.L.C., now 17, resumed her relationship with Sweet. In June 2021, M.L.C. ran away with Sweet again and was missing for over a month. On July 22, 2021, the FBI located M.L.C. and Sweet in Tulsa, Oklahoma, and took Sweet into custody. Notably, the car in which they were found had "Just Married" painted on the back window. *Id.* at 654, 683. Inside the car, investigators found luggage, an Arkansas marriage license, a Polish citizen application, passport applications for both Sweet and M.L.C., over $1,000 in cash, photographs of the two of them, multiple USB drives, an external hard drive, and two books: "Open Source Intelligence Techniques" and "Extreme Privacy: How to Disappear." *Id.* at 689. M.L.C.'s adoptive mother picked her up after being notified the FBI had arrested Sweet.

During their time on the lam, M.L.C. and Sweet attempted to get married. They first applied for a marriage license in Oklahoma, but M.L.C.'s adoptive mother, as her guardian, had it annulled because she had not given her consent, which was necessary because M.L.C. was a minor. After learning

6

that their Oklahoma marriage license application had been denied, M.L.C. and Sweet traveled to Arkansas and applied for another marriage license on July 14, 2021. However, M.L.C.'s adoptive mother had not provided her legally required consent for this marriage either.

M.L.C. testified at trial about the nature of her relationship with Sweet throughout its duration, including the sexual activities they engaged in. She disclosed that Sweet occasionally supplied her with drugs and alcohol. Sometimes when she would mix drugs and alcohol, they would engage in sexual intercourse. On one occasion, M.L.C. passed out and woke up naked, wet, and with vomit in her hair. Sweet informed her that they had engaged in sexual activity while she was intoxicated. On a separate occasion, Sweet penetrated M.L.C.'s vagina with a firearm. Additionally, there was one instance when M.L.C. was babysitting a deaf and mute child from her church who was under nine years old. While M.L.C. babysat this child, Sweet directed M.L.C. to inappropriately touch the child, which she did while Sweet masturbated. They also recorded videos of themselves having sexual intercourse at Sweet's house using M.L.C.'s iPhone. M.L.C. set up the camera as directed by Sweet, who told her where to place it, instructed her to press record, and specified what acts to perform.

During the FBI's investigation into Sweet, they recovered on a Google Drive account belonging to Sweet a screenshot of a Google Hangout

conversation, created on November 8, 2020, depicting M.L.C. nude and Sweet's penis, along with a video, created in September 2020, depicting M.L.C.'s breasts, pubic area, and vagina. From an Apple iCloud account belonging to M.L.C., they also recovered three videos of M.L.C. and Sweet engaging in sexual intercourse that were created on June 22, 2021.

While Sweet was in custody, M.L.C. continued communicating with him to maintain their romantic relationship. However, she ended the relationship and ceased communication with him in September 2021. Her adoptive mother filed for the annulment of the Arkansas marriage in October 2021.

## II

On November 1, 2021, a grand jury in the Northern District of Oklahoma returned a superseding indictment charging Sweet with seven counts: coercion and enticement of a minor, under 18 U.S.C. § 2422(b) (Count One); production of child pornography, under 18 U.S.C. §§ 2251(a), (e) (Counts Two, Five, Six, And Seven); receipt and distribution of child pornography, under 18 U.S.C. §§ 2252(a)(2), (b)(1) (Count Three); and possession of child pornography, under 18 U.S.C. §§ 2252(a)(4), (b)(2) (Count Four). Sweet entered a plea of not guilty.

One week before trial was to commence, the district court granted Sweet's request to represent himself, with his appointed counsel available to assist in a hybrid capacity. The case then proceeded to a jury trial in April

2022. The Government presented testimony from six witnesses before resting: (1) M.L.C.'s adoptive mother, (2) FBI Agent Evan Held, (3) FBI Information Technology Specialist Robert Harden, (4) FBI Special Agent Thomas Oelschlager, (5) M.L.C., and (6) FBI Agent Brian Dean. The defense then presented testimony from two witnesses: (1) Sweet's grandmother and (2) M.L.C. The jury found Sweet guilty on all seven counts.

Sweet received concurrent sentences of life for Count One; 30 years each on Counts Two, Five, Six, and Seven; 20 years on Count Three; and 10 years on Count Four. Sweet timely appeals.

## III

We now address the merits of the issues remaining on appeal, namely Sweet's (1) challenge to the sufficiency of the indictment with respect to the enticement charge, (2) allegations of prosecutorial misconduct related to inappropriate closing arguments, and (3) request for a new trial based on cumulative error.

## A

First, Sweet argues that his enticement conviction under 18 U.S.C. § 2422(b) (Count One) should be vacated because the indictment lacked sufficient factual detail to put him on notice of the Government's lewd molestation theory of guilt. Specifically, Sweet asserts he was not put on notice

9

that the Government would present evidence and argue one of the unlawful sexual activities he allegedly enticed M.L.C. to engage in involved the molestation of a child with disabilities.[3] As a result of the surprise testimony, he maintains he was prejudiced in his ability to present a defense against this allegation.

**1**

We begin with the statute at issue. Count One of the superseding indictment charged Sweet with violating or attempting to violate 18 U.S.C. § 2422(b), which holds liable any individual who,

> using the mail or any facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so . . . .

18 U.S.C. § 2422(b).

The relevant portion of the superseding indictment is as follows:

<u>**COUNT ONE**</u>
**[18 U.S.C. § 2242(b)]**

> From September 2019, to on or about July 26, 2021, in the Northern District of Oklahoma, the defendant, **ALEXANDER NICHOLAUS SWEET**, did use any facility of interstate and foreign commerce to knowingly persuade, induce, entice, and coerce, and attempt to persuade, induce, entice, and coerce, M.L.C., a minor who had not attained the age of 18 years and

---

[3] Such conduct may constitute lewd molestation under Oklahoma law. *See* 21 Okla. Stat. Ann. § 1123(5)(f).

whose identity is known to the Grand Jury, to engage in any sexual activity for which any person could be charged with an offense.

All in violation of Title 18, United States Code, Section 2422(b).

R.I at 72. Count One generally tracked the language of 18 U.S.C. § 2422(b). The only additional details it included were (1) an approximate two-year date range, (2) the federal district where the crime was committed, and (3) the identity of the victim. Notably, it did not include any facts about the underlying "sexual activity" that Sweet allegedly enticed or attempted to entice M.L.C. to engage in. The remaining counts pertained to the production, receipt, distribution, and possession of child pornography depicting M.L.C., as prohibited by 18 U.S.C. § 2251.

Prior to trial, the Government filed a trial brief and proposed jury instructions. The brief indicated that the criminal sexual activities supporting the enticement charge included the production of child pornography, the receipt and distribution of child pornography, and first-degree rape but did not mention lewd molestation. Additionally, the Government's proposed jury instruction that defined criminal sexual activity for purposes of Section 2422(b) listed several offenses that could constitute unlawful sexual activity with their elements: (1) producing or attempting to produce child pornography under federal law, (2) receipt or distribution of child pornography under federal law, (3) procuring minors for child pornography under Oklahoma law, (4) soliciting

sexual contact with minors via technology under Oklahoma law, and (5) rape in the first degree under Oklahoma law. The instructions did not include lewd molestation as an offense that could constitute unlawful sexual activity. Lastly, they also included an instruction on what constitutes an attempt and an instruction on the definition of grooming, providing that grooming can constitute a substantial step for purposes of attempt.

At trial, the topic of lewd molestation was first introduced during the Government's direct examination of M.L.C. The questioning focused on an incident where M.L.C. was babysitting a deaf and mute child from her church while Sweet was present:

GOVERNMENT: What happened with that deaf child, M.L.C.?

M.L.C.: I touched him.

GOVERNMENT: Who told you to touch that child?

*Id.* at 748.

Sweet objected to the last question, prompting the district court to instruct the parties (including Sweet, acting as his own counsel) to approach the bench for a sidebar, during which the following colloquy took place:

COURT: [Government Counsel], where are you going with this?

GOVERNMENT: Your Honor, part and parcel is that he used the internet to entice her to engage in sexual behavior for which any person can be prosecuted. As such, he's having her to perform a lewd molestation on a child. That is, in fact, something that someone could be prosecuted for.

> COURT: Is he charged with that?
>
> GOVERNMENT: No, sir, he's charged with everything within the boundaries of any sexual activity for which someone could be charged with a criminal offense.
>
> COURT: Is there a notice of that?
>
> GOVERNMENT: There is no notice of it, Your Honor. The way that it is pled is any sexual activity for which someone could be prosecuted. There's no notice that's required.
>
> COURT: Is there any video of that?
>
> GOVERNMENT: There's no video of that, Your Honor.
>
> SWEET: Was persuaded or enticed through the means of interstate commerce to affect this.
>
> GOVERNMENT: Again, Your Honor, it's part of the overall coercion and she doesn't have to be the victim. It's to entice any minor to engage in any sexual behavior for which any individual can be prosecuted. And what she's described is him and her can both be prosecuted for that. He, in essence, directed a lewd molestation of a minor child.

*Id.* at 748–49. The district court overruled the objection and allowed M.L.C. to continue to testify, where she stated that Sweet directed her to touch the child while he masturbated. She complied because he commanded, "You do it, or I do it," and she believed "it was better [her] than him." *Id.* at 749–50.

In closing, the Government referenced the lewd molestation to describe how Count One had been established:

> Finally, he groomed her to engage in sexual activity for which anyone can be charged with a crime. The judge gave you a list of

crimes. That's at jury instruction pages 14 through 16. Remember this can involve crimes both under federal law and Oklahoma law.

The government only has to prove that the defendant groomed her to engage in one of those crimes. At least one. So the defendant got this kid to start his homemade child porn. That's two. He got her to send her child porn of herself, which she told you he sent to his creepy, middle-aged friend. He groomed her to send him this child porn using social media.

When words weren't enough to get her to have sex with him, he uses violence by raping her with a gun. And, he even forces her to molest a 6- to 8-year-old little kid, a little deaf kid who can't speak up because of his disability, while he gets to look on. That's lewd molestation. That's six different crimes.

*Id.* at 956.

The final jury instructions provided the definitions and elements of the same five federal and state offenses constituting unlawful sexual activity listed in the Government's original proposed jury instructions. However, the instructions now included a definition of lewd molestation under Oklahoma law, previously absent from the Government's proposed jury instructions. Finally, the instructions included an instruction on attempted enticement, explaining that the statute criminalizes the sexual grooming of minors regardless of any intent to consummate the illegal sexual activity and provided a definition of grooming. Ultimately, Sweet was found guilty of Count One.

**2**

Before we proceed to the merits, we must address preservation and establish our standard of review. The parties vehemently dispute whether Sweet preserved his challenge to the specificity of the indictment.

Sweet contends that the issue is preserved for appeal because he objected to the testimony about the molestation during the trial. He points out that his objection led the district court to question the Government about the purpose of the testimony and whether he had received notice of their theory of enticement. Sweet maintains that once a district court rules on the merits of an issue, it is preserved for purposes of appeal, irrespective of whether the defendant adequately articulated the issue in the first instance.

The Government, in response, argues Sweet did not preserve this claim because he failed to file a motion pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) before trial to challenge the specificity of the indictment. The Federal Rules of Criminal Procedure stipulate that challenges to an indictment's sufficiency "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits . . . ." Fed. R. Crim. P. 12(b)(3). However, a court may still consider an untimely motion if the defendant establishes "good cause" for the late submission. Fed. R. Crim. P. 12(c)(3). By failing to either raise a timely Rule 12(b)(3) claim or show good cause to excuse the failure, the

15

Government asserts that Sweet has not preserved the issue. Additionally, the Government contends that Sweet did not file a motion for a bill of particulars under Federal Rule of Criminal Procedure 7(f), which they argue could have clarified their case theory and potentially mitigated any surprise at trial. Sweet maintains his objection was timely under Rule 12(b)(3) because it was not until the Government elicited testimony on its lewd molestation theory of enticement that "the basis for the motion" became "reasonably available." *See* Fed. R. Crim. P. 12(b)(3).

We agree that Sweet did not raise the issue before trial in a pretrial motion nor explicitly object to the line of questioning on the grounds of indictment sufficiency. However, we conclude that the district court sua sponte raised lack of notice and addressed the issue of sufficiency such that we can review it de novo. "[W]hen the district court sua sponte raises and explicitly resolves an issue of law on the merits, the appellant may challenge that ruling on appeal on the ground addressed by the district court even if he failed to raise the issue in district court." *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003). "In such a case, review on appeal is not for 'plain error,' but is subject to the same standard of appellate review that would be applicable if the appellant had properly raised the issue." *Id.*

Moreover, we conclude that Sweet's failure to file a bill of particulars does not indicate a waiver of his claim. Indeed, "it is a settled rule that a bill of

particulars cannot save an invalid indictment." *Russell v. United States*, 369 U.S. 749, 770 (1962).

Accordingly, "[w]e review the sufficiency of [the] indictment de novo." *United States v. Edwards*, 782 F.3d 554, 562 (10th Cir. 2015) (quoting *United States v. Gama–Bastidas*, 222 F.3d 779, 785 (10th Cir. 2000)). "[I]nadequacy of an indictment requires reversal only if it prejudiced the defendant." *United States v. Mobley*, 971 F.3d 1187, 1197 (10th Cir. 2020) (quoting *United States v. Harrold*, 796 F.2d 1275, 1278 (10th Cir. 1986)); *accord* Fed. R. Crim. P. 52(a).

**3**

The obligation to provide notice in an indictment originates from a defendant's Sixth Amendment right to be informed of the nature and cause of the charge against them. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); *United States v. Prentiss*, 206 F.3d 960, 964 (10th Cir. 2000). And the inclusion of all elements in an indictment is mandated by the Fifth Amendment, which ensures that the grand jury has considered and found all elements to be present. U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."); *Prentiss*, 206 F.3d at 964. While the Constitution necessitates certain fundamental requirements for indictments,

17

the specific pleading standards and procedural requirements for indictments are outlined in the Federal Rules of Criminal Procedure.

To understand today's criminal pleading standards, one must examine their historical origins. Prior to the implementation of the Federal Rules of Criminal Procedure in 1946, criminal pleading standards were dictated by common law. 1 Barbara E. Bergman et al., *Wharton's Criminal Procedure* § 5:1 (14th ed.). At common law, criminal pleading standards were notably intricate and demanding, requiring a detailed statement of both the facts and the legal theories underlying a charge. 5 Wayne R. LaFave et al., *Criminal Procedure* § 19.1(a) (4th ed.). This meant indictments were typically long, filled with technical jargon, and could be invalidated for minor errors in form.[4] *Id.*

---

[4] Take, for example, an indictment for first-degree murder committed on a federal reservation issued by a grand jury in federal court several years before the enactment of the Federal Rules of Criminal Procedure:

> In the District Court of the United States within and for the _____ Division of the District of _____ sitting at the City of _____, State of _____, at the _____, 19____ term of said court.

> The grand jurors of the United States in and for the District and Division aforesaid, duly empaneled, sworn, and charged, at the term aforesaid, by the court aforesaid, on their oaths, find, charge, and present that on or about the _____ day of _____, 19____, at and in the City of _____, in _____ County, State of _____, and upon land purchased and acquired by the United States of America for a United States Post Office and a United States Courthouse building, the real estate on which such building rests, being otherwise described as lots numbered _____, on _____ Street, all as disclosed by the recorded plat of the original town site of the

Moreover, defects in an indictment were not automatically waived if the defendant failed to object before trial. *Id.* In fact, many defects could still be contested post-conviction through a motion in arrest of judgment. *Id.*

---

City of _____, _____ County, State of _____, and the said real estate and building thereon being under the exclusive jurisdiction of the United States of America, the same having been purchased and acquired by the United States for such Post Office and Courthouse purposes by the consent of the Legislature of, and the laws of the State of _____ for the erection of such needful buildings of the United States, and such buildings and real estate being in the _____ Division of the District of _____, and within the jurisdiction of this court, one A.B. and one C.D. did then and there knowingly, willfully, unlawfully, purposely, deliberately, premeditatedly, feloniously, of their malice aforethought, and with the intent so to do, kill and murder X.Y., a human being, the said murder being perpetrated in the manner and form herein set forth by the said A.B. and C.D., then and there holding in their respective hands certain respective pistols, revolvers and small firearms, loaded with powder and leaden steel and metallic bullets, a more exact description of which firearms and bullets being to the grand jury unknown, and which said firearms so held respectively by the said defendants, A.B. and C.D., they, and each of them, fired, shot and discharged at, towards, against and into the body, abdomen, chest, and limbs of the said X.Y., thereby mortally wounding him, the said X.Y.; all of which the said A.B. and C.D. did with the willful, unlawful, deliberate, premeditated and felonious intent aforesaid, and with malice aforethought, as aforesaid, to kill and murder and take the life of him the said X.Y.; and that the said X.Y. from the effect of said bullets and the mortal wounds inflicted thereby did languish, and languishing did die on or about the _____ day of April, 19\_\_; all contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States of America.

Alexander Holtzoff, *Reform of Federal Criminal Procedure*, 3 F.R.D. 445, 448–49 (1944) (internal quotation marks omitted).

Consequently, courts reversed convictions otherwise substantiated by evidence "simply because indictments were inartfully drawn, awkwardly worded, or failed to include evidentiary detail." *Id.* Indeed, in our circuit, we declared: "If it may be said that there are two schools of judicial thought in regard to the indefiniteness of indictments, we of the Tenth circuit are committed to the more stringent rule . . . ." *White v. United States*, 67 F.2d 71, 78 (10th Cir. 1933); *id.* at 72, 78–79 (collecting cases and dismissing indictment charging the defendant with concealing property of a bankrupt corporation of which he was president due to the lack of specificity regarding the exact property alleged to have been concealed). Such a stringent pleading standard was motivated by several considerations, including as a check on the severity of penalties in early American history, when most crimes were capital offenses. *Wharton's Criminal Procedure* § 5:1.

The introduction of Rule 7(c) marked a significant shift towards simplifying criminal indictments. By requiring "a plain, concise, and definite written statement of the essential facts constituting the offense charged," Rule 7(c) moved away from the lengthy and technical common law pleading standard. Fed. R. Crim. P. 7(c) (1946) (using the same language as the current rule). This more relaxed approach is exemplified by the form indictments[5]

---

[5] These forms have since been abrogated. Fed. R. Crim. P. 7(c) 1944 advisory committee's note.

20

accompanied by the Federal Rules of Criminal Procedure when adopted, designed to illustrate the requirements of Rule 7(c). *See* Fed. R. Crim. P. 7(c) 1944 advisory committee's note (noting that "[t]his rule introduces a simple form of indictment"); Fed. R. Crim. P. 58 (1946). For example, the form indictment for first-degree murder under 18 U.S.C. § 1111 read as follows: "On or about the _____ day of _____, 19___, in the _____ District of _____, and on lands acquired for the use of the United States and under the exclusive jurisdiction of the United States, John Doe with premeditation shot and murdered John Roe." Fed. R. Crim. P. 58, Appendix of Forms, Form 2 (1946).

The Supreme Court has only reaffirmed the more lenient criminal pleading standard. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself . . . ." *Id.*

Following the Supreme Court, our court has also recognized the more lenient pleading standard that followed the enactment of Rule 7: "Therefore, where the indictment quotes the language of a statute and includes the date, place, and nature of illegal activity, it need not go further and allege in detail the factual proof that will be relied upon to support the charges." *United States*

21

*v. Powell*, 767 F.3d 1026, 1030 (10th Cir. 2014) (quoting *United States v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008)).

More specificity is required, however, when a statute's text does not itself "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling*, 418 U.S. at 117 (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)). In those circumstances, the language of the statute "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description [of the statute], with which [the defendant] is charged." *Id.* at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).

"Most [circuits courts] that have addressed [the issue of factual sufficiency] appear to approve the practice of tracking the statute as long as the words used expressly set out all of the elements necessary to constitute the offense." *United States v. Kay*, 359 F.3d 738, 756 (5th Cir. 2004) (collecting cases). "The cases in which an indictment that parrots the statute is held to be insufficient turn on a determination that the factual information that is *not* alleged in the indictment goes to the very *core of criminality* under the statute." *Id.* at 756–57.

"The Supreme Court took this approach in *Russell v. United States*, in which it found indictments defective because the allegations under 2 U.S.C.

22

§ 192, which prohibits witnesses before congressional committees from 'refus[ing] to answer any question pertinent to the question under inquiry,' failed to identify the 'question under inquiry.'" *Id.* at 757 (quoting *Russell*, 369 U.S. at 752 n.2). "The Court ruled that the 'core of criminality' under the statute was the pertinency to the subject under inquiry of the question a witness refused to answer." *Id.* (quoting *Russell*, 369 U.S. at 764). "The Court stated: 'Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.'" *Id.* (quoting *Russell*, 369 U.S. at 771). "The Court concluded that the indictments failed this test because, even though they did list the questions that the defendants had refused to answer, they failed totally to specify the topic under inquiry, which was the key to the legality or illegality of the defendants' acts." *Id.* (quoting *Russell*, 369 U.S. at 765–68). "In short, the defendants faced trial with the 'chief issue undefined.'" *Id.* (quoting *Russell*, 369 U.S. at 766).

Lastly, for the defendant to be prejudiced, they must establish that they lacked "notice of the crime of which [they] stood accused . . . ." *Edwards*, 782 F.3d at 562 (quoting *Gama–Bastidas*, 222 F.3d at 786).

**4**

We next examine whether the mere repetition of the unlawful "sexual activity" element was constitutionally sufficient to provide Sweet with

23

adequate factual notice of the Government's lewd molestation theory of liability. *Compare* 18 U.S.C. § 2422(b) ("to engage in . . . any sexual activity for which any person can be charged with a criminal offense") *with* Superseding Indictment, R.I at 72 ("to engage in any sexual activity for which any person could be charged with an offense"). This issue is one of first impression for our circuit, and we observe that no circuit court has held that an indictment under 18 U.S.C. § 2422(b) is required to outline the specific unlawful sexual activity at issue or reference the statute that criminalizes such behavior.

To start, the parties identify only two instances where our court has deemed an indictment insufficient on its face. The first, decided in 1946, did not refer to the newly enacted Rule 7 and found the charge against a defendant who failed to perform his duties under a selective service statute insufficiently specific because it did not provide any detail as to what duties (or how many of them) the defendant failed to perform. *Lowenburg v. United States*, 156 F.2d 22, 22–24 (10th Cir. 1946). The second case, from 1973, did analyze Rule 7 and reversed convictions for mail fraud because the indictment set forth "little more than the statutory language," with only bald references to a "scheme and artifice to defraud" that did not provide "any fair indication of the nature or character" of the fraudulent scheme. *United States v. Curtis*, 506 F.2d 985, 989–92 (10th Cir. 1974). However, neither of these cases convinces us that our precedent requires reversal here.

24

Considering the more relaxed criminal pleading requirements of modern criminal procedure, we hold the Government was not required to list in the indictment every unlawful "sexual activity" to be proven at trial when charging a violation of 18 U.S.C. § 2422(b). The core of criminality for an 18 U.S.C. § 2422(b) offense is "not the performance of the sexual acts themselves" but rather "persuasion and the attempt to persuade." *United States v. Isabella*, 918 F.3d 816, 831 (10th Cir. 2019) (quoting *United States v. Faust*, 795 F.3d 1243, 1249 (10th Cir. 2015)). This is further evidenced by the fact that Sweet was also charged with attempted enticement, which does not require any unlawful sexual activity to actually occur. When, as here, there are many instances of unlawful sexual activity that a defendant is on notice of, *see United States v. Lopez*, 4 F.4th 706, 721 (9th Cir. 2021) ("The breadth of Section 2422(b)'s language is intentional . . . ."), some of which were also included as separate counts in the superseding indictment, it suffices to merely cite "the language of a statute and . . . the date, place, and nature of illegal activity," *Powell*, 767 F.3d at 1030. To require more would return us to the stringent common law pleading standards of another era, which were decisively abandoned with the enactment of the Federal Rules of Criminal Procedure.

In addition, Sweet fails to establish prejudice. Despite Sweet's surprise when M.L.C. testified about the lewd molestation and the Government's concession at trial that no notice of this accusation had been provided to

Sweet,[6] the jury was not required to unanimously agree on a specific theory of unlawful sexual activity. *United States v. Powell*, 226 F.3d 1181, 1196 (10th Cir. 2000) ("Elements . . . must be found unanimously by the jury. On the other hand, the jury need not agree unanimously on the *means* by which an element is proven." (citation omitted)). Rather, they simply needed to agree that the element of unlawful sexual activity had been satisfied. *See, e.g.*, *United States v. Jockisch*, 857 F.3d 1122, 1126–33 (11th Cir. 2017) (holding that the jury need not unanimously agree on the specific unlawful sexual activity the defendant was attempting to entice a minor to engage in under 18 U.S.C § 2422(b), provided there is unanimous agreement that the activity would violate at least one applicable statute).

Sufficient evidence was presented at trial to sustain this element based on the Government's multiple theories of liability. This includes the other six counts of the superseding indictment relating to the production, receipt, distribution, and possession of child pornography that depicted M.L.C., as prohibited by 18 U.S.C. § 2251. The Government detailed these additional counts in its pretrial brief and proposed jury instructions, and they were supported by digital evidence presented at trial, culminating in Sweet's conviction beyond a reasonable doubt. Further, the Government's theory of

---

[6] Also, neither the record nor the parties mention whether this accusation was presented to the grand jury.

unlawful sexual activity based on a forcible rape involving a firearm was corroborated by M.L.C.'s testimony. Contrary to Sweet's assertions, lewd molestation was not the only means that could satisfy the unlawful sexual activity element. The plain language of 18 U.S.C. § 2422(b), as clarified by 18 U.S.C. § 2427, includes the production of child pornography. 18 U.S.C. § 2427 ("In this chapter, the term 'sexual activity for which any person can be charged with a criminal offense' does not require interpersonal physical contact, and includes the production of child pornography, as defined in section 2256(8).").

Lastly, defense counsel argued in closing that the lewd molestation theory of enticement was the weakest means asserted by the Government. Indeed, the alleged act of lewd molestation lacked the use of any facility of interstate commerce, as M.L.C. testified this conduct occurred in person without the use of interstate communications or items. Therefore, Sweet cannot meet his burden to show prejudice because it is almost certain the jury did not rely solely on the lewd molestation theory as the means to satisfy this element of the crime.

In conclusion, Sweet fails to establish the superseding indictment was facially insufficient as to Count One.

27

**B**

Next, Sweet contends we should order a new trial on all counts because the Government committed misconduct by making improper comments during closing arguments. He classifies the Government's remarks into two categories: (1) those condemning him for exercising his Sixth Amendment rights under the United States Constitution and (2) those that misrepresent the evidence and attack his character. We address each category of comments in turn.

**1**

"Prosecutorial misconduct violates a defendant's due process rights if it infects a trial with unfairness and denies the defendant the right to a fair trial." *United States v. Currie*, 911 F.3d 1047, 1055 (10th Cir. 2018). "Prosecutorial misconduct can cause constitutional error in two ways." *Id.* at 1055 n.6. "First, it can prejudice a specific constitutional right, amounting to a denial of the right." *Id.* "Second, 'absent infringement of a specific constitutional right, a prosecutor's misconduct may in some instances render a . . . trial so fundamentally unfair as to deny [a defendant] due process.'" *Id.* (quoting *Underwood v. Royal*, 894 F.3d 1154, 1167 (10th Cir. 2018)). Sweet asserts both

types of errors occurred here: the former with the first category of comments, and the latter with the second category.

Improper comments made during closing arguments may constitute such misconduct. *United States v. Kepler*, 74 F.4th 1292, 1315 (10th Cir. 2023). Although "the [g]overnment is entitled to a reasonable amount of latitude in drawing inferences from the evidence during closing arguments," this latitude is not limitless.[7] *Id.* at 1316 (quoting *United States v. Hammers*, 942 F.3d 1001, 1016 (10th Cir. 2019)).

Neither Sweet himself nor his counsel lodged objections to the Government's comments at trial, so "we review for plain error." *United States v. Anaya*, 727 F.3d 1043, 1053 (10th Cir. 2013). "Under plain error review, reversal is warranted only when [1] the prosecutor's statement is *plainly improper* and [2] the *defendant* demonstrates that the improper statement affected his or her substantial rights." *United States v. Shamo*, 36 F.4th 1067, 1082 (10th Cir. 2022) (quoting *United States v. Christy*, 916 F.3d 814, 826–27

---

[7] The government cannot, for example, (1) comment on a defendant's failure to take the stand, (2) refer to matters not in evidence, (3) encourage the jury to let sympathy for the victim influence its decision, (4) vouch for the credibility of a government witness, (5) give its personal views on the case, (6) distort the record by misstating evidence, (7) misstate the law, (8) make derisive comments about opposing counsel in front of the jury, (9) appeal to the jury's passion and prejudice, (10) imply a jury has a civic duty to convict, or (11) otherwise invite the jury to base its decision on irrelevant considerations. *United States v. Christy*, 916 F.3d 814, 824–26 (10th Cir. 2019) (collecting cases); *United States v. Kepler*, 74 F.4th 1292, 1316 (10th Cir. 2023).

(10th Cir. 2019)). If these conditions are satisfied, we may exercise our discretion to correct the error, provided it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005).

"To be plain, an error must be 'clear' or 'obvious,' meaning it is contrary to well-settled law." *Currie*, 911 F.3d at 1057 (quoting *United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008)). "We ordinarily consider an error 'clear or obvious' 'only when the Supreme Court or our court has addressed the issue.'" *United States v. Herrera*, 51 F.4th 1226, 1248 (10th Cir. 2022) (quoting *United States v. Leal*, 32 F.4th 888, 897–98 (10th Cir. 2022)). An error affects substantial rights if "there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017) (en banc) (quoting *United States v. Algarate-Valencia*, 550 F.3d 1238, 1242 (10th Cir. 2008)).

## 2

Sweet contends that the first category of remarks included accusations from the Government during its rebuttal argument that he victimized M.L.C. by cross-examining her. These remarks, he argues, unjustly criticized him for exercising his Sixth Amendment rights to represent himself and confront the witnesses against him. Recall that during trial, Sweet's defense was conducted

in a hybrid capacity with both his appointed counsel and Sweet himself defending the case. Sweet personally conducted the cross-examination of M.L.C. when she appeared as a government witness and her direct examination when she was called as a defense witness. M.L.C. was the only witness who Sweet personally examined. Appointed counsel first chaired the defense during both sides' closing arguments; he made objections to the Government's closing and delivered Sweet's closing argument.

We now turn to the relevant comments made in closing arguments. For context, Sweet's appointed counsel in closing stated:

> The testimony from M.L.C. was that she has an addiction to pornography. Isn't it possible that she just wanted to create some pornography? Okay.
>
> And I'm sure the United States is going to get up here and say, oh, [Defense Counsel] is a terrible person, he's victim blaming. Well, you should never be afraid to speak the truth. The truth is, she said she has an addiction to pornography. When Mr. Sweet met her, she was already broadcasting pornography into the ether. It happened while he was dating her. She continued to broadcast the images.

R.I at 970–71.

In rebuttal, the Government remarked:

> *[The defense] chose to cross-examine the victim in this case and further victimize her.* [Defense Counsel] says that, now, I'm sure the government is going to say that I'm victim blaming. No, [Defense Counsel], you didn't have to do that. Your client during his cross-examination did an ample job of blaming a 15-year-old girl at the time, 16 and 17, still troubled with absolutely zero chance other than her own wits, which she seems to be performing

31

marvelously under, you did just a perfect good job of blaming her for everything.

*Id.* at 977 (emphasis added).

To understand the potential impropriety of the Government's comments, it is essential to consider a criminal defendant's rights. Two bedrock constitutional guarantees enshrined by the Sixth Amendment include a criminal defendant's right to (1) represent themselves, *Faretta v. California*, 422 U.S. 806, 818, 836 (1975), and (2) face and cross-examine all witnesses testifying against them, *Coy v. Iowa*, 487 U.S. 1012, 1016–17 (1988). Although Sweet does not cite binding precedent specifically addressing similar comments, he references the general principle that "[w]hen a defendant exercises constitutional . . . rights in the course of criminal proceedings, the government may not punish [them] for such exercise without violating due process guaranteed by the federal Constitution." *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991). This principle makes clear that just as the government cannot "comment[] on a defendant's failure to take the stand," as is their right under the Fifth Amendment, *Christy*, 916 F.3d at 824 (citing *Griffin v. California*, 380 U.S. 609, 611–12 (1965)), it is likewise inappropriate to suggest that a defendant exercising their Sixth Amendment right to cross-examine a government witness is somehow nefarious, *see Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1130 (10th Cir. 2009) ("To imply or argue

32

that the mere act of defending oneself . . . is reprehensible serves no proper purpose, and for time out of mind it has been the basis for appellate courts ordering new trials."). Generally, such comments lack any rational connection to assisting the jury in evaluating the merits of the case. And they put the defendant in a precarious position of either pursuing their rights and facing government criticism or relinquishing their rights to avoid it.

"When read in isolation, the prosecutor's statement could potentially support [Sweet's] position." *United States v. Fleming*, 667 F.3d 1098, 1105 (10th Cir. 2011). This is because to state or suggest that a criminal defendant is re-victimizing a witness by personally cross-examining that witness improperly suggests to the jury that they should penalize the defendant for exercising such rights. However, "when evaluating whether a statement is improper, we must view the statement in context." *Id.* In context, the Government's statement was in response to defense counsel's suggestion that the Government would accuse Sweet of victim blaming. "We have repeatedly recognized that considerable latitude is given [to] the prosecutor in closing argument in replying to an argument raised by defense counsel's closing statement." *Id.* (quoting *United States v. Janus Indus.*, 48 F.3d 1548, 1558 (10th Cir. 1995)). By raising the topic of victim blaming and her potential culpability in the charged offenses, defense counsel invited the prosecutor to

33

fairly comment about it during rebuttal argument. Thus, the Government's comments here were not plainly improper.

**3**

The next group of comments at issue are those Sweet describes as attacking his character, painting him out to be someone with a propensity for, and previous history of, abusing children. Specifically, the Government relayed to the jury that:

> The defendant knowingly received and distributed that child porn of the victim. Whenever the defendant doesn't have physical access to kids, he keeps digital trophies of his crimes. It's not enough for him to rape a kid, he has to personalize it. He even sends them to his friends – his friend like they're a Hallmark greeting card.

R.I at 959. Sweet asserts that this was no stray remark and that the Government advanced the idea that Sweet was a predator who behaved in the way that predators as a class behave, using information about M.L.C.'s background to make that point. The Government further said to the jury during closing:

> Predators choose the weakest of the herd. Predators choose people whose parents are drug addicts, whose parents abandon them, whose parents are, to the very day they get involved with someone like this, more than happy to sign off and say, hey, go get married, we understand, we've got meth addictions, we're in prison.
>
> Predators choose people that are alienated. Predators choose people who don't have a lot of friends. Predators choose people who are very confined. Predators choose people who are unhappy in their home. And then they pounce, which is exactly what happened here.

*Id.* at 975–76. Sweet takes issue with these comments because he proclaims there was no evidence presented at trial to indicate that he had previously committed any crimes against or possessed photos of other minors other than M.L.C. The Government disputes this position.

To be sure, a prosecutor's statement that distorts the record by misstating the evidence or referring to matters not in evidence is improper. *Christy*, 916 F.3d at 824–25. However, Sweet fails to point us to a Supreme Court or Tenth Circuit case that has "found a due process violation in similar circumstances." *Herrera*, 51 F.4th at 1248. As such, these comments were not *plainly* improper.

**4**

Not only does Sweet fail to establish any error or that any arguments were plainly improper, he also cannot establish that the prosecutor's comments affected his substantial rights. An error affects a defendant's substantial rights if "there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Bustamante-Conchas*, 850 F.3d at 1138 (quoting *Algarate-Valencia*, 550 F.3d at 1242). We "must weigh any

improper comments against the strength of the evidence against the defendant." *Christy*, 916 F.3d at 824, 830.

It is unlikely that the Government's closing arguments influenced the trial's outcome because it presented overwhelming evidence to prove Sweet's guilt. M.L.C. testified at length as to her relationship with Sweet, including the various sexual activities they engaged in, and the Government presented digital evidence of the child pornography to corroborate M.L.C.'s testimony. As such, reversal is not warranted because of prosecutorial misconduct.

## C

Lastly, Sweet argues the cumulative prejudice from the above-alleged errors requires reversal on at least Count One. "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Lopez-Medina*, 596 F.3d 716, 740–41 (10th Cir. 2010) (quoting *Hooper v. Mullin*, 314 F.3d 1162, 1178 (10th Cir. 2002)). "Where, as here, a defendant 'has failed to establish the existence of multiple non-reversible errors (i.e., harmless errors and plain errors failing to necessitate reversal)[,] . . . [the defendant] cannot benefit from the cumulative error doctrine.'" *Id.* at 741 (quoting *United States v. Barrett*,

36

496 F.3d 1079, 1121 (10th Cir. 2007)). Consequently, because Sweet fails to establish any error, there is no need to aggregate or apply the cumulative error doctrine.

AFFIRMED.